473 So.2d 482 (1985)
Paul W. FLANAGIN
v.
STATE of Mississippi.
No. 55620.
Supreme Court of Mississippi.
July 24, 1985.
*483 Rex K. Jones, Hattiesburg, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and ANDERSON, JJ.
PATTERSON, Chief Justice, for the Court:
Paul W. Flanagin was convicted in the Circuit Court of Lamar County and sentenced to life imprisonment for the murder of his ex-wife, Sharon Herzner Flanagin.
On May 25, 1982, at approximately 4:25 p.m., Paul Flanagin phoned the Lamar County Sheriff's Department and informed them that his wife had been shot. Three deputies were then dispatched to Flanagin's house.
Medic Sheila Hall arrived at the scene at approximately 4:35. Flanagin showed her to the room where his wife was lying on a bed with a bullet wound to the chest. According to Hall, Flanagin was distraught at the time. He was arrested shortly afterward by the Lamar County Sheriff.
Flanagin testified Sharon had resumed living with him after their November 1981 divorce and that they had planned to remarry in June 1982. On the day of Sharon's death, the couple had driven home from Florida, where they had spent a four day vacation. According to Flanagin, Sharon had became despondent on the way home upon consuming several beers and speculating about her future as a sufferer of multiple sclerosis.[1] Flanagin testified,
Of my own knowledge ... she had multiple sclerosis, and ... she had lost most of her eyesight in her left eye, and *484 she was going blind in her right eye ... She kept telling me that she would never be anything but a burden to me and the kids; it was just one illness right after another.
Upon the couple's arrival home, Sharon went into their bedroom and sat cross legged on the bed with her back to the headboard. At this point she was disconsolate. Her husband tried briefly to console her. He testified he went back to the car to retrieve his wife's cigarettes and upon his return to the bedroom, found her sitting in bed with a gun in her lap. She was crying and threatening to kill herself.
Flanagin sat down on the bed about a foot and a half from his wife, took the gun out of her lap and placed it in his own. Flanagin described what happened next:
She looked at me real weird, and she dove at me and dove at the gun, and she was trying to grab the gun away from me, and I went over backwards into the bed. I was sitting there, and I fell over backwards, and I was looking up at the ceiling  when I went over backwards, that gun went off.
State's witnesses cast the incident in a much different light. J.B. Sykes testified Sharon called his Indianola, Mississippi office collect on May 25 at 4:00. Sykes testified regarding the conversation:
Well, she said, "J.B., this is Sharon. Is Larry there," to be exact, and I said, "No, he's not, Sharon. What's the matter?" And she was crying or snubbing like, and she said, "I'm in trouble." That was her words, and I said, "Well, get a hold of yourself." She was kind of hysterical ... and I said, "Sharon, what's the matter? ..." and there was a slight four or five second pause there ... and she said, "I need to talk to Larry." I said, "Well, I'm sorry, can I help you?" About that time she said, "J.B., my husband is going to kill me," and I heard a gun go off or what sounded to be a gun, and the phone hit a metal  it sounded like the phone fell and hit a metal of some sort.
As Sharon was talking Sykes heard a male voice in the background accusing Sharon in indelicate language of infidelity.
Mason Sistrunk, an investigator for the Lamar County District Attorney's office, testified he had determined a long distance call was placed about 4:00 o'clock on May 25 from a location within the state to Sykes' office in Indianola. Sistrunk's personal investigation of the Flanagin house revealed a bedside telephone which could be reached by a person lying on the bed in a prone position.
Dr. James E. Williams, III, who performed the autopsy, testified the wound was not a contact wound and that in his opinion the angle of the bullet was slightly downward.
Forensic Scientist John Michael Allen testified neutron tests had been inconclusive, making it indeterminable whether Paul and/or Sharon Flanagin had discharged the firearm at the time in question.
Flanagin first contends the court committed reversible error in admitting testimony from Investigator Mason Sistrunk concerning the record of the collect telephone call from the deceased to J.B. Sykes.
On direct examination Sistrunk testified he had investigated Flanagin's telephone records and had determined a long distance call was placed from the Flanagin residence on the date of the incident. The defense objected on the ground the State had not laid the proper predicate for this evidence. The court overruled the objection, permitting Sistrunk to testify he had examined the telephone records pursuant to a subpoena duces tecum and had ascertained a phone call had been placed. The court ruled further that the recipient of the call, J.B. Sykes, would not be allowed to base his testimony on Sistrunk's evidence; rather, Sykes would be required to independently identify Mrs. Flanagin's voice unless the telephone records were introduced.
Observing the State made no effort to introduce the telephone records and offered no explanation for their absence, Flanagin *485 now argues the admission of Sistrunk's testimony violated the best evidence rule.
In a similar case a witness, in testifying to establish the first element of corpus delicti, relied in part on hospital records which were not introduced into evidence. White v. State, 306 So.2d 299 (Miss. 1975). We reversed, following a long line of cases holding that recollection testimony is not admissible regarding writings whose nonproduction is unexplained. E.g., Brown v. State, 227 Miss. 823, 827, 87 So.2d 84, 85 (1956); Peter v. State, 12 Miss. (4 S. & M.) 31, 36 (1844).
We find no justification for Sistrunk's recollection testimony in this case. The State made no attempt to explain the absence of the telephone records. Further, the error had a strong potential for prejudice in that it allowed official endorsement of Sykes' already damaging testimony regarding the phone call. While the State characterizes Sistrunk's testimony as merely cumulative, our opinion is it was prejudicially cumulative and independently damaging. The admission of the testimony was harmful error requiring reversal.
Secondly, we address Flanagin's argument that the court erred in failing to instruct the jury that the State was required to prove Flanagin guilty to the exclusion of every other reasonable hypothesis consistent with innocence, as required in cases based solely on circumstantial evidence.
The State cites Holliday v. State, 455 So.2d 750 (Miss. 1984), for the proposition that the case against Flanagin was not purely circumstantial. That case held:
In our opinion, one piece of direct evidence prevents this case from being characterized as one based entirely on circumstantial evidence: that is the testimony by Prentiss Hawkins that he heard Holliday admit shooting his ex-wife. While we think the better practice is to give an instruction such as D-2 in a case where there is very little direct evidence, we cannot here hold the trial court in error for failing to do so.
455 So.2d at 752-53.
In this case Sykes testified Sharon Flanagin told him over the telephone that her husband was going to kill her. In the background Sykes heard accusatory language followed by what he perceived to be a gunshot, whereupon the line went dead. The State contends Sykes was an "ear" witness by virtue of his having heard the shooting.
At first glance the Holliday rule would appear to apply to this case, especially since Sykes was more closely connected to the actual crime than was Prentiss Hawkins in Holliday. However, a critical complication is that Sykes was unacquainted with Flanagin and therefore could not identify the voice in the background as his. Thus the would-be direct evidence in this case does not establish the identity of the offender. In Holliday, the "one piece of direct evidence" not only identified the defendant but constituted an admission.
We therefore cannot characterize Sykes' testimony as direct evidence. Because Sykes could not identify the voice in the background, we are of the opinion his testimony was not direct evidence.
Further, we have held a telephone conversation between the victim and her mother did not constitute direct evidence in a case of murder as the result of an illegal abortion, although the victim did tell her mother she was at Dr. McCaskill's office having her pregnancy terminated. McCaskill v. State, 227 So.2d 847, 852 (Miss. 1969).
Moreover, although the defendant did testify at trial, he maintained the shooting was an accident and therefore provided no aid to the State's case. Therefore Flanagin's testimony does not in our opinion constitute direct evidence. See Pitts v. State, 241 So.2d 668 (Miss. 1970); McCaskill at 849, 852.
Although the telephone conversation between the victim and Sykes was not direct evidence, we reject Flanagin's argument that the court erroneously admitted this testimony. A case closely on point is McCaskill, 227 So.2d at 847. In it, the *486 defendant was on trial for murder in the death of his patient from post-abortion complications. The mother of the deceased testified her daughter had told her over the telephone that she was at Dr. McCaskill's office "getting something done" about her pregnancy. 227 So.2d at 849. This Court held the trial court did not abuse its discretion in admitting this testimony under the res gestae exception.
In this case Sykes testified Sharon Flanagin told him immediately prior to the shooting that her husband was going to kill her. In our opinion the declaration could hardly be more closely linked with the crime. As in McCaskill, the victim identified the defendant to a third person just prior to the offense. Because this declaration is so immediately entangled with the crime, and because Sykes unequivocally identified Sharon's voice, the court is of the opinion the trial court did not err in admitting Sykes' testimony.
We briefly address the additional assignments of error which in our opinion do not require reversal. First, Flanagin contends the court erred in not permitting Dr. James S. Sabin to testify regarding Flanagin's grief and depression following Sharon's death. Dr. Sabin, a psychiatrist, had examined Flanagin two days after the shooting. The court disallowed the testimony with the following ruling:
Let the record show that the testimony of Dr. Sabin that has been elicited by the defense is only cumulative and repetitious of the testimony of both the defendant and Dr. Hughes; that it adds nothing to the testimony already elicited from these two individuals; that Dr. Sabin was neither asked nor volunteered any opinion as far as an expert is concerned as to the causation of the problems that he found the defendant suffering on May 27 ... that the court would have to surmise from the testimony elicited from Dr. Sabin that these symptoms or mental disorders or disturbances or emotional disturbances .. . what type of disturbance they were and could have been caused from any number of sources ...
At the time of this ruling both the defendant and Dr. Wayne Hughes had testified regarding Flanagin's emotional disturbances following the shooting. The State had not disputed the fact that Flanagin experienced mental pain and suffering but questioned whether this disturbance should properly be called "grief." Further, the State took the position that even genuine grief was not relevant to the issue of guilt.
Flanagin argues Harrelson v. State, 217 Miss. 887, 65 So.2d 237 (1953), is authority for reversal. That case held it was improper for officers to testify at defendant's murder trial that the defendant had shown no signs of grieving for his wife, the victim. The Court stated,
The demeanor acts and conduct of an accused, at the time and subsequent to the crime are admissible. However, this should be limited to a statement of the facts by the witness or witnesses, leaving the jury free to form its own conclusions ... The opinion of the sheriff, a prominent official of the county, that the appellant showed no signs of grief conveyed to the jury the impression that the sheriff thought the appellant was guilty ...
217 Miss. at 891, 65 So.2d at 239.
In our opinion Harrelson is not authority for the admission of Dr. Sabin's testimony, especially in view of the fact that such testimony was cumulative. The opinion simply recognized the unfairness of subjecting a defendant to an objective "grieving test." It did not hold a defendant is entitled to show evidence of grief. There is no merit in this proposition.
It is next argued the court erred in refusing defendant's instruction No. D-4 under the Weathersby rule. Once again that rule is set out as follows:
[W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material *487 particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933).
The defendant's version of the homicide was contradicted at the very least by State's witness J.B. Sykes. Moreover, we have great difficulty reconciling the physical evidence, particularly the angle of the bullet, with Flanagin's account. In our opinion the Weathersby rule is inapplicable to this case.
Finally, Flanagin contends the court erred in granting Instruction S-7, which allowed the jury to find Flanagin guilty of manslaughter by culpable negligence. We are of the opinion Flanagin, having been convicted of murder, is in no position to argue that any prejudice resulted from this instruction. We therefore conclude this assignment of error is without merit.
We are of the opinion this case must be reversed due to the violation of the best evidence rule and the absence of the circumstantial evidence instruction.
REVERSED AND REMANDED.
WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] The record does not reveal whether Sharon in fact had multiple sclerosis.