481 So.2d 203 (1985)
Larry R. FISHER
v.
STATE of Mississippi.
No. 56050.
Supreme Court of Mississippi.
October 16, 1985.
*206 William B. Jacob, H.C. "Mike" Watkins, Meridian, for appellant.
Edwin Lloyd Pittman, Atty. Gen., Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, Charles Wright, Dist. Atty., Meridian, for appellee.
EN BANC.
ROBERTSON, Justice, for the Court.

I. Overview

The tensions inherent between the constitutionally vested rights of the press to be free and one criminally accused to a fair trial have troubled this and other states for years.
On the one hand, we regard freedom of the press as essential to the security of our democratic society. At the same time our law vests in each person charged with a crime the right to be tried in the courtroom, not the newspaper, the right to have his or her guilt pronounced only by the jury, not the media. Our law has provided a mechanism for accommodation of these rights: the change of venue.
Today we are presented the case of Larry Fisher, who has been convicted of capital murder and sentenced to die. In a very real sense Fisher's guilt was announced by the news media of Meridian, Mississippi, loudly and long before a Lauderdale County jury was ever impaneled to hear the case. By this he was denied his right to a fair trial before the trial began. In this context we regard that the trial judge abused his discretion in refusing Fisher's motion for a change of venue. We reverse and remand.

II. The Case Below

A. The Circumstantial Case For the Prosecution

Melinda Gail Weathers, an eighteen year old high school senior, was reported missing on Wednesday night, May 4, 1983, when she failed to return home after a softball game at the Sammy Davidson Complex in Meridian, Mississippi. Sometime that night, after 9:00 p.m., her car was seen abandoned on the side of Highway 11/80 East several miles east of Meridian and facing her hometown of Russell, Mississippi, her supposed destination. When the car was found by law enforcement officers on Thursday morning of May 5, 1983, it had been moved on to the northbound side of Highway 45 Bypass.
Four days later, on May 7, 1983, Melinda's body was discovered by a search party approximately 75 yards off Angel Road on an old logging trail. Angel Road is off Highway 45 and is about three miles north of where the car was found. Her body was naked except for the socks and tennis shoes on her feet and a green shop rag between her legs. Two autopsies determined that death was caused by asphyxia due to manual strangulation. Time of death was estimated to have been between the late evening hours of May 4 and early morning hours of May 5. The autopsy also determined that Melinda had had sexual contact with a male within a short time prior to her death.
After the discovery of Melinda's body, law enforcement authorities theorized that the suspect might be the same individual about whom they had received reports from another female, Pat Rivers, who had been stopped and raped along Highway 11/80. The similar rape-murder of a second girl, Carol Formby, was only suspected at this time  Formby had disappeared prior to May 4 but her body was not discovered until June 9, four days after the arrest of the defendant. In any event, the office of the Lauderdale County Sheriff in conjunction *207 with the Meridian police organized a decoy operation designed to attract a suspect whose mode of operation had been to stop lone female drivers along the highway, under one pretext or another, rape, and in at least two suspected instances, kill them.
For a full month after Weathers disappeared and her body had been found, the perpetrator of the crime remained at large. In the early hours of Saturday morning, June 4, 1983, the decoy, who no doubt appeared to be a lone female, was driving on Highway 11/80 heading towards Russell. In fact, Detective Bobby House was concealed in the backseat, crouched down on the floor behind the driver's seat and out of view and a backup car with two other detectives, S.A. Thomas and L.B. Robbins, was following the two at a discreet distance. A pickup truck approached from behind and flashed its headlights off and on. The decoy driver pulled over and stopped, the pickup truck pulled in behind and also stopped. The driver of the pickup got out and approached and as he reached the decoy driver Detective House sprang from the backseat and arrested the startled Larry Fisher[1] at which point the backup car arrived.
After Fisher's arrest, a cursory search[2] was made of his truck, and the officers recovered several items: a homemade "for sale" sign, a multicolored towel, some pieces of hair, and a green mechanic's rag. Other searches were conducted at his residence and place of employment but we are not told whether any items were recovered.
On Sunday, June 5, another search was made at which time Detective S.A. Thomas discovered a gold Italian horn pendant, in the ashtray of Fisher's truck. The Crime Lab searched the truck on June 6 and a Marlboro cigarette box was taken from the front seat.[3] The search[4] by the Crime Lab personnel lasted for about two and a half hours, and included the dash area both visually with the aid of a flashlight and by reaching into any crevice under the dash by hand.[5] Another search was conducted on Tuesday, June 7, by Detectives Thomas, Robbins, House and Franklin. During this search, Detective Thomas inspected the area under the seat of the truck and found a small earring back. As Thomas explained it:
... We came from the sheriff's office, and Deputy Ernest Jackson opened the truck door and we moved it out and opened the door. And I did a  squatted down to the ground and done a visual search before actually entering the vehicle. And at that time is when I saw the piece of metal [the earring back] under the seat between the  where the seat brackets to the floor and also the seat belt brackets to the floor and a rib in the design of the truck bottom.
On the day Melinda Gail Weathers disappeared she had on her class ring, her watch, a gold chain with her good luck charm  an Italian horn pendant  on it, and a pair of gold nugget earrings. When her body was discovered, it had the Seiko watch, the class ring and one earring[6] in the left ear. One of the earrings was easily sprung and would come off. Melinda's *208 mother identified the Italian horn pendant found in the ashtray of Larry Fisher's truck as Melinda's.
Ms. Pat Eddings, a forensic scientist at the Mississippi Crime Lab, conducted an examination on the back of the earring found on Melinda's body and the back of an earring found in Larry Fisher's truck by Detective Thomas and compared the two. She concluded:
From the microscopic examinations and also from the elemental composition comparison work that I did, I did discover that both the earrings ... were similar in size, in their design, in their construction, and in their elemental composition.
As a part of the autopsy performed on May 7, Dr. John Davis examined the genital area and found a before death injury to the right of the clitoris of the victim's body. Dr. Leroy Riddick performed a subsequent autopsy with findings substantially the same except as to the external injury to the right of the clitoris. Whereas Dr. Davis identified this as a split, Dr. Leroy Riddick characterized this as "a little zone of discoloration, hyperemia or increased amount of blood flow." In his opinion, this was a before death injury.
Dr. Davis noted the presence of spermatozoa in the vaginal washings taken from Melinda's body. The presence of spermatozoa, of course, indicates sexual contact with a male. Dr. Riddick took specimen (vaginal swabs) from the vagina area. Both specimen were examined by Mr. Larry Turner of the Mississippi Crime Lab. Both specimen contained seminal fluid. Based on his findings, Turner could not exclude Mr. Fisher as the individual whose seminal fluid was found in the specimen taken from Melinda Gail Weathers. The effect of Turner's testimony was that the man with whom Melinda had had sexual contact could have been anyone of approximately 45 percent of the male population of the United States, and that Larry Fisher could not on the basis of the tests be excluded from that 45 percent.
Pubic hair was recovered from the floor area of the passenger side of Larry Fisher's truck. This specimen was examined together with a known sample taken from the defendant and it was determined that they came from the same person, namely Larry Fisher. No pubic hair coming from the victim was found on Fisher or in his truck. Conversely, no pubic hair attributable to Fisher was found on Weathers or on the rag found on her body. Hair samples that were taken from the victim, Melinda Weathers, were compared with hair samples from the rag[7] found between her legs, these samples do match. These were her hairs, however, not Fishers'.
At this point the evidentiary investigation of the case against Larry Fisher took an unexpected turn. On July 13, 1983, Fisher's truck  which had been sitting on the Sheriff's parking lot since June 4, 1983, was released to his mother, Mrs. Betty Ream. The truck was then taken to the parking lot of Nelson Hall Chevrolet, the former employer of her son. Mrs. Ream had intended to sell the truck to Hall, but they could not agree on a price. Sometime that afternoon the truck was test run by an employee by the name of Robert Mansour, who subsequently parked it by the back of the lot. Although the lot has a chain link fence, the gates to the lot were not locked. Sometime later that afternoon, Mansour got back into the truck with a Joe Canterbury who had informed him that Larry has a BMW radio in the truck. They played a cassette tape that was in the glove compartment. Joe Canterbury left and another employee, Paul Lundy, joined Mansour. Mansour asked Lundy if he thought "they searched everywhere" meaning whether the law enforcement officers conducted a thorough search. Paul Lundy then told *209 him that he, Paul Lundy, "knew of a secret stash; that Larry Fisher had told him about." At this point, Mansour "stuck his hand up underneath the dash, and that's when [he] discovered a crush proof Marlboro cigarette box." This is the second Marlboro box.[8]
The second Marlboro box contained pieces of jewelry; one of these being the gold necklace that was later identified as belonging to Melinda and which she had been wearing on the day of her disappearance. The other pieces were identified as belonging to Carol Formby, another female who had disappeared under similar circumstances and whose body was found four days after Fisher's arrest. For obvious reasons, the Formby evidence was not presented to the jury below.
Mansour took his find to his office at the Chevrolet dealership and called the sheriff's office. Detective David Franklin came to pick up the Marlboro box and its contents. In a statement first given to Detective Franklin, explaining how he discovered the box, Mansour said that the box fell out when he stepped on the emergency brake. Two days later, he changed his version of the story to reflect what he testified to both in the motion to suppress and in the guilt/innocence stage of the trial, the "secret stash" explanation.
Gary Church, the owner of the Cycle Center, testified that on or around May 24 or 25, 1983, some three weeks after the Weathers murder, Fisher had shown him a necklace. Fisher was interested in knowing its value and whether anybody might be interested in buying it. The witness was then shown the necklace that was found in the second Marlboro box. He identified it as being the same as the one Fisher showed to him. Melinda's mother had identified this necklace as belonging to the victim and the same one she wore on the day of her disappearance.
Daniel Stanford also identified the "Marlboro" necklace as the one Larry attempted to sell to him. On cross-examination he could differentiate between Larry's necklace and Melinda's necklace which is the Marlboro necklace but could not tell the difference between Mrs. Ream's (Larry's mother) necklace and Melinda's necklace.[9]

B. The Defense

Larry Fisher took the stand in his own defense. He was an auto mechanic employed at Nelson Hall Chevrolet, the site of the discovery of the (second) Marlboro box containing the jewelry. As a working man, his routine on weekdays was to go to work at about 7:15 in the morning, get off work at about 5:30 and go home. He visited bars and other night spots on Fridays and Saturdays. Some days, during the week, he might do odd jobs for friends.
On May 4, 1983, he did some work for Gary Church at the Cycle Center until about a little after 9:00 p.m. when he left and went home to retire for the night. He got home around 10:00 p.m. Dirty with sawdust, he took a shower, watched T.V. and went to bed. He did not leave the house again until the next day when he left for work, as usual, in the morning.
He owns a white courier pickup truck; smokes Marlboro cigarettes in the crush proof box; does not have a secret stash in his truck and does not read the papers. His truck does not have bright lights because its dimmer switch is broken; the horn does not work and the locks on the door can be opened from the inside. Because of defects on the driver side door, it is even easier to open the passenger door than the driver door.
One time while cleaning his truck he found a pendant similar to the one in evidence and he put it in the ashtray. He goes out on dates in his truck and he has dated a few girls in his time but not Melinda. *210 He does not know her. He had a "For Sale" sign with his telephone number on it in his truck.
On the night of June 4, he was bar hopping with a friend. At one of the stops he met a friend named Ron and a girl by the name of Linda Butler. Later that evening after dropping off his friend he went to another bar and saw a female who looked like Linda getting into a car. He yelled out her name, but the female apparently did not hear as she got into her car and backed out and drove towards the highway. Still thinking that she did not hear him yell out her name, he followed her into the highway flashing his lights off and on in an attempt to signal her. When she did not stop, he slowed down and was about to make a turn when he saw the brake lights come on on the car. That was when he drove up to her car. He yelled "Linda" while leaning out of the window. That was when, according to Fisher, the officer walked up to him still in his truck and arrested him. He was interrogated and he told them he thought the girl was Linda. At the time he did not know any other information about her and was therefore unable to offer any more definite particulars.
When law enforcement officers found the pendant, he told them that he did not know who it belonged to. They told him that it belonged to Melinda and he denied it because he did not know any girl by that name.
During the course of his work he had come by a cap and, of course, he uses rags that are generally used by mechanics. He had tried to sell his necklace to Gary Church in March, two months before the murder. On cross-examination, Fisher was asked whether he had flashed his lights and pulled over Pat Rivers and Marsha Pigot. He denied this. He also denied pulling over Melinda, raping her, taking a necklace from her, and strangling her. Fisher admitted that he had previously been convicted in Georgia of rape, kidnapping and robbery by intimidation.
The crux of Fisher's defense was an alibi. On the evening of May 4, he was assisting Gary Church and Daniel Stanford in some remodeling work at the Cycle Shop, next door to Nelson Hall Chevrolet, Fisher's place of employment. However, this was largely destroyed when Gary Church testified that Larry worked at the Cycle Center on the 2nd of May instead of the 4th as he (Church) had previously told an investigator. The prior out of court statement was admitted into the record. The witness explained the inconsistency in the date by tendering for identification a purchase receipt for the materials used in the remodeling work.
Further testimony that destroyed Fisher's alibi was elicited from Daniel Stanford. Like Church, Stanford had originally made a statement to the effect that he was with Fisher on the night of May 4, 1983, in connection with the remodeling of the Cycle Shop. At trial Stanford said this occurred on May 2, not May 4. The combined testimony of Church and Stanford left Fisher without an independent witness to corroborate his alibi.
Mrs. Betty Ream, the mother of Larry Fisher, further corroborated her son's testimony about the 4th of May, to-wit:
He was dirty, he had sawdust on him, he had his shop clothes on ... This was shortly before 10:00 p.m. He had a saw that he had borrowed from my husband. He went to bed very early during the week because he had to get up and go to work at 7:30.
Fisher's stepfather testified that Larry used his skill saw and he remembered one night when he returned it and he went out to check it. However, he could not remember the date.

C. Proceedings Below

On December 1, 1983, Larry R. Fisher, Defendant below and Appellant here, was formally charged with the capital murder of Melinda Gail Weathers while he was engaged in the crimes of rape and robbery, contrary to Miss. Code Ann. § 97-3-19(2)(e) *211 (Supp. 1984). Fisher entered a plea of not guilty to all charges.
On January 20, 1984, Fisher filed a motion for change of venue. That motion was called for hearing on February 2, 1984, at the conclusion of which the trial judge announced that he would withhold his ruling, pending voir dire examination of the prospective jurors called for the trial of the case.
On the morning of April 16, 1984, the case was called for trial on its merits in the Circuit Court of Lauderdale County, Mississippi. At the conclusion of voir dire examination of the prospective jurors, the trial judge announced that Fisher's motion for change of venue was finally overruled.
Thereafter, the trial proceeded until on April 20, 1984, the jury returned a unanimous verdict that Fisher was guilty as charged in the indictment.
In due course thereafter, Fisher was put to trial on the question of sentence. On April 21, 1984, the jury unanimously found three aggravating circumstances to-wit:
(1) The capital offense was committed for pecuniary gain;
(2) the capital offense was especially heinous, atrocious or cruel; and
(3) the defendant was previously convicted of a felony involving use or threat of violence to a person.
The jury further found that these aggravating circumstances
are sufficient to impose the death penalty and that there are insufficient mitigating circumstances, and we unanimously find that the defendant should suffer death.
From this conviction and sentence, Fisher appeals.

III. Heightened Scrutiny On Appeal Of Death Penalty Cases

As a part of the organic law of this state, there is a principle that on appeal convictions of capital murder and sentences of death will be subjected to heightened scrutiny. As stated in Irving v. State, 361 So.2d 1360 (Miss. 1978),
We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. [citation omitted] What may be harmless error in a case with less at stake becomes reversible error when the penalty is death.
361 So.2d at 1363; Jones v. State, 461 So.2d 686, 690 (Miss. 1984); Billiot v. State, 454 So.2d 445, 455 (Miss. 1984); Neal v. State, 451 So.2d 743, 750 (Miss. 1984); Williams v. State, 445 So.2d 798, 810-11 (Miss. 1984); Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982).
This principle requires that trial errors be considered not necessarily individually but for their cumulative effect. Russell v. State, 185 Miss. 464, 469, 189 So. 90, 91 (1939). Bona fide doubts are resolved in favor of the accused. Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908).
While there may be legitimate differences of opinion as to just when and how "heightened scrutiny" works in death penalty cases, it would seem clear that this approach is most needed and most applicable in cases resting upon circumstantial evidence and where the matter of whether the defendant is guilty at all is by no means free of all doubt. As the facts suggest, this is an appropriate case for heightened scrutiny.

IV. Sufficiency Of The Evidence

A. General Considerations

The gravamen of Fisher's assignments of error numbers 1, 2 and 7 is that the State's evidence was legally insufficient to establish certain elements of the crime of capital murder, particularly the underlying felonies of rape and robbery. Fisher correctly notes that, before a conviction of any crime may stand, there must be in the record evidence sufficient to establish each element of the crime. Edwards v. State, 469 So.2d 68, 70 (Miss. 1985); Watson v. State, 465 So.2d 1025, 1031 (Miss. 1985); Neal v. State, 451 So.2d 743, 757 (Miss. 1984).
*212 The statute under which Larry Fisher has been indicted, tried and convicted is found in Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1984). There, this state has declared that:
The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
...
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape ... [or] robbery ... or in any attempt to commit such felonies.
It follows that a valid Section 97-3-19(2)(e) capital murder conviction must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony had either been charged alone. See Moore v. State, 344 So.2d 731, 735 (Miss. 1977). Here, for reasons not apparent, the State took on the burden of proving two underlying felonies. In both the indictment and the jury instructions, the underlying felonies are stated "rape and robbery". In addition to all of this, causal nexus (... engaged in the commission of ...) must also be shown.
Procedurally, the point placed before us has been preserved by Fisher's several efforts at trial to secure direction of a verdict of acquittal. At the conclusion of the State's case, Fisher moved that a verdict be directed in his favor and that the charges in the indictment be dismissed. That motion was denied. Thereafter, at the conclusion of all of the evidence, Fisher requested a peremptory instruction in his favor. That request was denied. Following the return of the jury's verdict, Fisher renewed his request for a peremptory instruction via a motion for judgment of acquittal notwithstanding the verdict of the jury. In the alternative, Fisher moved for a new trial. As indicated above, the point is the substance of three of Fisher's assignments of error here.
Here, Fisher tests the legal sufficiency of the evidence supporting the verdict of guilty on each element of the offense of capital murder. Where such a point is presented to this Court on appeal, we must, with respect to each element of the offense, consider all of the evidence  not just the evidence which supports the State's case  in the light most favorable to the State. Williams v. State, 463 So.2d 1064, 1067 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984); Callahan v. State, 419 So.2d 165, 174 (Miss. 1982); Sadler v. State, 407 So.2d 95, 97 (Miss. 1981). The credible evidence which is consistent with the verdict must be accepted as true. Spikes v. State, 302 So.2d 250, 251 (Miss. 1974). We may reverse only where with respect to one or more elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Cook v. State, 467 So.2d 203, 208-09 (Miss. 1985); Bullock v. State, 447 So.2d 1284, 1286-87 (Miss. 1984); Dickerson v. State, 441 So.2d 536, 538-40 (Miss. 1983). Matters regarding the weight and credibility to be accorded evidence are to be resolved by the jury. Neal v. State, 451 So.2d 743, 758 (Miss. 1984). Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980).
Where as here the evidence of guilt is largely circumstantial, the State is required to prove the accused's guilt not only beyond a reasonable doubt but to the exclusion of every other reasonable hypothesis. Keys v. State, 478 So.2d 266 (Miss. 1985); Flanagin v. State, 473 So.2d 482, 485 (Miss. 1985); Hester v. State, 463 So.2d 1087, 1093-94 (Miss. 1985); Bennett v. State, 374 So.2d 803, 805 (Miss. 1979); Martin v. State, 361 So.2d 68, 70 (Miss. 1978); Westbrook v. State, 202 Miss. 426, 432-33, 32 So.2d 251, 252 (1947). We must keep well in mind this separate articulation of the State's burden of proof as we consider these assignments of error.

B. The Underlying Felony Of Rape

Fisher does not seriously argue that the evidence is insufficient to convict him of murder. Rather, the attack in these assignments of error concentrates on the supposed *213 inadequacy of the State's proof regarding the two underlying felonies  rape and robbery.
Before Fisher could be found guilty of the rape component of this capital murder indictment, it was necessary that the State prove beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence that, with felonious intent, Fisher engaged in unlawful sexual intercourse with Melinda Gail Weathers by actual penetration of her vagina against her will by the use of force or by threatening her with personal injury. Miss. Code Ann. § 97-3-65(2) (Supp. 1984); Clemons v. State, 460 So.2d 835, 838 (Miss. 1984); Wilson v. State, 221 So.2d 100, 103 (Miss. 1969).
The fact of recent sexual contact with a male was established by the State's forensic scientist who testified positively to the presence of spermatoza in the vagina. The semen test, though hardly conclusive, nevertheless failed to exclude Larry Fisher as the perpetrator.
Fisher challenges the evidence here respecting the issues of force and threats. His challenge runs aground when it encounters the circumstantial evidence placed before the jury. The jewelry strongly suggests that Melinda Gail Weathers was indeed in the truck with Larry Fisher on the night of May 4, 1983. This, coupled with the evidence that Fisher had never known Melinda before and the fact that she was found strangled to death several days later, establishes to any reasonable mind that anything done to Melinda on the night of May 4, 1983, was done against her will by the use of force or by threatening her with personal injury. The evidence shows that one of the things that happened to Melinda on that night was sexual intercourse with a male. Applying the general test described above with respect to review of jury verdicts in criminal cases, even considering that this is a circumstantial evidence case in which the death penalty has been imposed, we find the evidence on this issue sufficient and thus have no authority to disturb the jury finding that Larry Fisher had sexual intercourse with Melinda Gail Weathers against her will and by use of force or threatening her with personal injury.
Absent a confession, intent necessarily must be established by circumstantial evidence. Voyles v. State, 362 So.2d 1236, 1242-43 (Miss. 1978). It is both common sense and common law that a man be held to have intended that which he did. Here the evidence (recited more fully in Section II(A) above) is such that reasonable jurors could well have found beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that on the evening of May 4, 1983, Melinda Gail Weather was raped, that the person who committed the rape was Larry Fisher, that Fisher acted with felonious intent, and that the rape occurred in substantial temporal and factual relation to her murder at the hands of Larry Fisher.

C. The Underlying Felony Of Robbery

The State also undertook the burden of proving the underlying felony of robbery. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1984). The indictment charged Fisher with murder in the course of rape and robbery. The trial judge's instructions (requested by the State) told the jury that before it could convict Fisher of capital murder it would have to find that he killed Melinda Gail Weathers while in the course of committing rape and robbery; hence, Fisher's challenge to the sufficiency of the evidence to establish the underlying felony of robbery.
Robbery is defined in this state as the felonious taking of the personal property of another, in his or her presence or from his or her person and against his or her will, by violence to his or her person or by putting such person in fear of some immediate injury to his or her person. Miss. Code Ann. § 97-3-73 (1972); Harper v. State, 434 So.2d 1367, 1368 (Miss. 1983); see also Glenn v. State, 439 So.2d 678, 680 (Miss. 1983). Because of the wholly circumstantial nature of the State's evidence against Larry Fisher, here again the State *214 was required to prove each element of the offense beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with Fisher's innocence.
There is evidence that Fisher took from Melinda Gail Weathers several pieces of jewelry, personal property having some value, although modest. The same evidence mentioned above would enable any reasonable juror to conclude beyond a reasonable doubt that this taking was by violence to her person or by putting her in fear of immediate personal injury. Fisher's felonious intent is similarly shown by that which the established facts and circumstances show that he did. Wheat v. State, 420 So.2d 229, 238-39 (Miss. 1982); Voyles v. State, 362 So.2d 1236, 1242-43 (Miss. 1978). We hold that the evidence in this case was legally adequate to establish that Larry Fisher committed the underlying felony of robbery of Melinda Gail Weathers.

D. The Jury Is The Least Imperfect Institution We Have For Determining Guilt Or Innocence In Cases Such As This

To be sure, this is a circumstantial evidence case. We have reviewed the entire record with some care. We would be less than candid if we did not state forthrightly that we have some doubts. Nevertheless, from a review of the record, we are left with a definite impression that Larry Fisher probably killed Melinda Gail Weathers and incident thereto raped and robbed her.
This issue, however, turns not upon how we see the evidence, for there are, well established in hundreds of cases, rational and necessary limitations upon our scope of review of jury verdicts the substantial components of which involve resolution of issues of fact. We have said repeatedly  most recently in Section IV(A) above  that, if there is substantial evidence in the record of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions regarding the guilt of the defendant, we have no authority to disturb the jury's guilty verdict. See, e.g., Burge v. State, 472 So.2d 392, 396 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984). Here we are subject to the same limitations on our scope of review, only we are required to keep in mind the arguably stricter burden of proof placed upon the state in circumstantial evidence cases. See, e.g., Flanagin v. State, 473 So.2d 482, 485 (Miss. 1985); Hester v. State, 463 So.2d 1087, 1093-94 (Miss. 1985).
In saying these things we are sensitive to the fact that a rational, fair-minded jury could well have found Fisher not guilty. Cases such as this force upon us the reality that our self-imposed limited scope of review of jury verdicts is at best "the least imperfect way we have of ... [resolving such matters]". As in Culbreath v. Johnson, 427 So.2d 705 (Miss. 1983)
Were we to substitute our view [of the reasonable inferences that may be drawn from] the facts for the... [jury's], one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings are made by ... [twelve citizens, peers of the defendant, who are on the scene and smell the smoke of the battle].
427 So.2d at 708; Burge v. State, 472 So.2d at 396; see also City of Jackson v. Locklar, 431 So.2d 475, 479 (Miss. 1983).
The jury was generously instructed regarding Fisher's theories of defense. When the applicable standards, as described above, are applied to the evidence in this case, affirmance is required on Assignments of Error Numbers 1, 2 and 7. The trial court correctly denied Fisher's request that the jury be instructed peremptorily to return a not guilty verdict as well as his subsequent motion for judgment of acquittal notwithstanding the verdict of the jury.

V. Change Of Venue

A. The Procedural Context

Fisher's next assignment of error is that the trial judge erred when he denied Fisher's *215 motion for a change of venue. Citing pre-trial media publicity and prejudice against him in the community, Fisher asked that his trial be moved out of Lauderdale County and to a county where such influences did not exist. He suggested Hinds County, Mississippi, some ninety miles away.
The motion was heard by the trial judge on February 2, 1984, at the conclusion of which ruling was reserved pending voir dire examination of the jurors called for the trial of the case. That took place on April 16, 1984, whereupon, at the conclusion of jury selection, the trial judge announced that in his opinion the proceedings on voir dire reflected that Fisher could get a fair trial in Lauderdale County. The trial judge then overruled Fisher's motion for change of venue.

B. The Right To A Fair Trial

We have repeatedly held that the matter of whether venue should be changed in a criminal proceeding is committed to the sound discretion of the trial judge. See, e.g., Winters v. State, 473 So.2d 452, 457 (Miss. 1985); Cabello v. State, 471 So.2d 332, 339 (Miss. 1985); West v. State, 463 So.2d 1048, 1053-54 (Miss. 1985); Billiot v. State, 454 So.2d 445, 454 (Miss. 1984). A corollary premise is that we will not reverse for failure to grant a change of venue unless the trial judge has abused his discretion.
We have repeated these notions so often in recent years that we have tended to overlook that the venue decision is committed to the trial judge's sound discretion, not his unfettered discretion. Our discussions of the point have been cryptic, superficial. E.g., West v. State, supra, 463 So.2d at 1053-54. As our recent decision in Johnson v. State, 476 So.2d 1195 (Miss. 1985) well demonstrates, we have overlooked some of our earlier cases which contain much wisdom and are still good law.
The sound exercise of the discretion vested in the trial judge when faced with a motion for change of venue must be informed by the evidence presented at the venue hearing coupled with the trial judge's reasoned application of his sense of the community and, particularly in a case such as this, an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of a community. No resort to expert psychological or behavioral science testimony is necessary to inform the judicial mind of that which common sense and experience have taught. A venire drawn from a fair cross-section of the community in theory and in fact is supposed to, and generally will, represent that community  and reflect the biases and prejudices of that community  as every judge and lawyer who has ever picked a jury well knows. The trial judge must also exercise his discretion consistent with legally established criteria which, as we will explain below, require more than the mere selection of twelve jurors against whom no challenge for cause may lie. Johnson v. State, 476 So.2d at 12; Seals v. State, 208 Miss. 236, 248-49, 44 So.2d 61, 67 (1950).
Fundamentally, the trial judge and this Court as well must keep ever in mind that a motion for change of venue raises not only a procedural point; rather, the office of the motion is to afford the accused that most fundamental of all rights he possesses under our law: his right to a fair trial before an impartial jury, secured to him by Miss. Const. Art. 3, §§ 14 and 26 (1890).[10] We recently noted in Johnson,
A fair trial is, after all, the reason we have our system of justice, it is a paramount distinction between free and totalitarian societies.
476 So.2d at 1209.
Article 3, § 14 of our constitution provides that "no person shall be deprived of life, liberty or property except by due process of law". We have construed this provision as guaranteeing to an accused a fair *216 trial. Brooks v. State, 209 Miss. 150, 155, 46 So.2d 94, 97 (1950). Put otherwise, under our law an accused has a due process right to a fair trial. Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982). If an unbiased jury is not impaneled, it does not matter how fair the remainder of the proceedings may be.
A complementary constitutional guarantee is found in Section 26 of our Bill of Rights which provides that "in all criminal prosecutions the accused shall have a right to ... trial by an impartial jury ..." As with Section 14, Section 26 articulates a valid rule of constitutional dimensions.
Because Larry Fisher has been accused of a crime, he is within the coverage of these rules and entitled to enjoy the rights they confer, foremost here the right to a fair trial. Changing venue is one of the means our law affords accuseds for vindication of this right. See, e.g., Seals v. State, 208 Miss. at 248, 44 So.2d at 67.
We have recently observed in a related context that
Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness... .
Mhoon v. State, 464 So.2d 77, 81 (Miss. 1985).
Scrupulous regard for the accused's right to a fair trial  and to trial in a fair venue  is a complementary counterpart to our rules respecting jury verdicts discussed in May v. State, 460 So.2d 778, 781 (Miss. 1984) and in Section IV above. Because on appeal we must as a matter of practical and institutional necessity defer to jury determinations of fact questions, we must be vigilant that the jury making such findings is infected by not the slightest taint or suggestion of bias or unfairness.
When it is doubtful that a fair and impartial jury can be obtained in the county where a homicide has been committed, an accused on trial for his life "is but asking for his rights when he requests a change of venue". Johnson v. State, 476 So.2d at 1210; Seals v. State, 208 Miss. at 248, 44 So.2d at 67; Eddins v. State, 110 Miss. 780, 783, 70 So. 898, 899 (1916). Whatever interest the State may have in proceeding in the county of the offense and however legitimate may be that interest, it is by definition subordinate to vested rights secured to the accused. We do not in this state sacrifice an accused's fundamental rights in favor of the State's pragmatic interests. See e.g., In Re Brown, 478 So.2d 1033, 1037 (Miss. 1985); Read v. State, 430 So.2d 832, 840 (Miss. 1983); Brooks v. State, 209 Miss. at 155, 46 So.2d at 97; Fisher v. State, 145 Miss. 116, 134, 110 So. 361, 365 (1926).
Another premise that should be called to mind is that the security of rights vested in an individual is not diminished in proportion to his or her guilt. The fact that we may consider, as we do above, that the evidence of Fisher's guilt is sufficient to place the jury's guilty verdict beyond our authority to disturb on appeal in no way waters down the rights otherwise secured to him by our law. All persons accused of crimes are entitled to a fair trial, the innocent as well as the not so innocent. The point was well put in Tennison v. State, 79 Miss. 708, 31 So. 421 (1902):
It is one of the crowning glories of our law that no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystalized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in case of the guiltiest as of the most innocent defendant answering at the bar of his country.
79 Miss. at 713, 31 So. at 422. See also Johnson v. State, 476 So.2d at 1209; Seals v. State, 208 Miss. at 249, 44 So.2d at 61; Scarborough v. State, 204 Miss. 487, 37 So.2d 748, 750 (1948).

C. The Pre-Trial Media Publicity

These fundamental considerations well in mind, we turn to the relevant evidence before *217 the Court on the change of venue issue.
Our dominant concern is the saturation media coverage  television, radio and newspaper  given the prosecution of Larry Fisher. That coverage repeatedly highlighted a number of features of this case which we regard as of great importance: (1) that during the spring of 1983 several young women driving alone at night on Highway 11/80 leaving Meridian going east had been stopped by an unknown assailant, thus generating a community awareness (and attendant fear) that there was a multiple sex offender loose in the area; (2) that Larry Fisher was not charged with a single sex-related murder but also with the rape murder of a young woman named Carol Formby and the rape of yet another woman; (3) that Fisher had a previous rape conviction in Georgia and was on parole at the time; (4) that the evidence against Fisher (including evidence that he was guilty of the Formby rape-murder) was repeatedly included in the reports. Particularly important is that much of the coverage  most prominently that regarding the Formby rape murder  communicated to the people of Lauderdale County damning facts against Fisher that were not admissible as evidence in the trial below.
The coverage in the daily newspaper, The Meridian Star, makes the point, for Larry Fisher was tried and found guilty by The Star not only of the capital murder of Melinda Gail Weathers but also of the capital murder of Carol Formby long before he faced a Lauderdale County jury. The Star, it should be noted, has a daily circulation of near 24,000 in Lauderdale County alone.[11]
The Star's coverage from the beginning linked the Weathers and Formby murders. For openers, the front page of the May 5, 1983 edition contained an article describing the disappearance of the Weathers girl on her way home from the softball game.[12] It also indicated that Weathers' car
was found about a mile from where one belonging to Carol Formby  another county woman who has been missing since March 27  had been abandoned.
The two crimes were again linked on May 7 when The Star printed a story headlined "Search For Missing Pair Intensifies". This story announced that a local television station, WHTV, had become actively involved in the search for clues in the two cases.
The following day, Sunday, May 8, 1983, the lead story on the front page of The Star announced the discovery of the body of Melinda Gail Weathers. On May 9 almost one-half of the front page of The Meridian Star was taken up with two stories, a picture and a map related to the Weathers murder. On May 10th, The Star returned to the Formby case reprinting a picture of the Formby girl and a lead story rehashing her March 27 disappearance.
On May 11 again the lead story in The Star referred to both the Weathers and Formby cases and included a photograph of a bloodhound used in searching for clues in the Formby case. Thursday, May 12, 1983, was no different: the lead story recounted and rehashed what was then known about both crimes. The matter returned to The Star's front page on Sunday, May 15 with a story largely concerning the Formby case.
On Monday, May 16, 1983, once again the lead story in The Star described the investigations in the Weathers and Formby cases. After a two day absence, the story returned to The Star's front page on May 19, 1983. Although for the next several days The Star was preoccupied with reporting *218 an unrelated murder, the matter involving Miss Formby returned to the front page on May 22, 1983, with a public appeal for help in locating her remains.
Taking the month of May, 1983 as a whole, The Meridian Star devoted more coverage  and more prominent coverage  to the combined Weathers-Formby cases than to any other matter. The only serious rival story was that regarding another unrelated homicide.
With the arrest of Larry Fisher on June 4, 1983, the Weathers-Formby story  now with Fisher as the likely perpetrator  again grabbed the headlines. For example, on June 6, 1983, the lead story on the front page of The Star described Fisher's arrest and showed pictures of the Weathers and Formby girl. The story reported that Fisher had been paroled on September 9, 1982, from Georgia
where he was serving a fifteen year sentence on rape, kidnapping and robbery-by-intimidation charges.
The story then stated:
the incident in which he was convicted [in Georgia] .. . was very similar to the one he is now charged in connection with, and involved a young woman traveling alone on a deserted road, ...
On its editorial page, referring to an unrelated rape charge, The Star then declared that Fisher
fits the description given by the woman [Pat Rivers] at the time she reported the attack. She now has picked him out of a police lineup.
On June 8, 1983, The Star again made Fisher's arrest its lead story. Here the article described in detail the law enforcement decoy operation which had been designed "to attract a man turned predator". In the next column from this comment is Fisher's inmate photograph furnished by the Georgia Department of Corrections. The article repeatedly emphasized the danger that faced the young women in the decoy operation and thus implanted in the reader's mind that the source of this danger was Fisher.
On June 9, 1983, The Star was dominated by a news story and photograph description of the discovery of the body of Carol Formby. Although at the time Fisher had not been charged with the Formby murder, the story nevertheless reported that Fisher was being held in the Lauderdale County Jail and that he had been arrested
in connection with the February rape of a 44 year old county woman [Pat Rivers].
Beginning June 11, 1983, and for several days thereafter, The Star printed front page stories regarding a finger pointing controversy between local law enforcement and state parole officials, the bone of contention being whether Meridian law enforcement authorities had been notified that Fisher, the Georgia parolee ex-rapist, was in Lauderdale County. This brouhaha reached its climax when The Star on June 24, 1983, published an editorial criticizing parole policies and stating
the two young women [Weathers and Formby] might be alive today if that state [Georgia] had a no-parole law for such crimes.
This comment can only be construed as an editorial pronouncement by The Star that Fisher was guilty of the murder of both Weathers and Formby.
Meanwhile, on June 22, 1983, The Star published a front page story reporting that Fisher had been charged in connection with a rape in February of 1983. Though the story did not name the victim, this has reference to the alleged rape of Pat Rivers.
Throughout the summer, The Star continued to report on the Fisher case. Typical of the tenor of the articles is one appearing on July 9, 1983, the lead paragraph of which reads:
Enmeshed in a web of circumstantial evidence, a 30 year old Meridian man [Fisher] being held without bond awaits the next round of legal proceedings after being charged with capital murder Friday.
Story after story included references to Fisher as a previously convicted rapist, as a Georgia parolee and treated him as equally the perpetrator of the Weathers and Formby *219 rape-murders and the Rivers rape (although Rivers' name is never disclosed). Fisher's picture is published on a number of occasions and on several occasions pictures of the Weathers and Formby girls are printed side by side.
On July 14, 1983, again in a lead story on the front page, The Star reported the "discovery" of the Marlboro cigarette box by Robert Mansour and Paul Lundy.[13] The lead was:
New `critical evidence' linking Larry Fisher, already facing capital murder charges in connection with the death of one county woman [Weathers], to the death of nineteen year old Carol Formby has been discovered .. .
The story then described in detail the gold chain necklace and the gold Italian horn pendant. The story may only be read as announcing that any doubt of Fisher's guilt had thus been removed. The point was repeated on July 15, 1983, as the lead story on the front page opened with this language:
Evidence that sealed the link between thirty-one year old Larry Fisher and a dead Lauderdale County woman has been sent to the State Crime Lab, authorities said Thursday.
Altogether more than 60 stories were published, most of which were front page, lead stories reporting such things as Fisher having been ordered to undergo a psychiatric examination, his having been denied release on bail, the grand jury indictment, and the like.
On January 1, 1984, The Star published a story regarding the top news events of 1983 in the Meridian area. The Weathers and Formby rape-murders are listed as top stories and are accompanied by a picture of Larry Fisher.
As late as January 24, 1984, we find The Star running a front page story reporting that Fisher's trial had been delayed until April 16, 1984, and, in a comment typical of many of the news stories in its description of the State's evidence against Fisher, this one reports:
Prosecutors unveiled forensic tests on a quantity of jewelry reported found in Fisher's truck, and later identified by the victim's father as belonging to Miss Weathers.
Also reported found in the truck was jewelry identified as Miss Formby's after the vehicle had been released to Fisher's family.
During the month preceding the April 16, 1984 trial date The Star exercised restraint  although the damage had already been done. A significant lapse, however, occurred on April 10, 1984, when The Star printed a highly inflammatory article. The story ran on the front page of the second section under a four column headline and told of defense efforts to subpoena a witness who would supposedly testify that Weathers was involved in drug activities, implying that someone with whom she had had drug dealings (and not Larry Fisher) had killed her.[14] The lead paragraph of the story sets its tone:
The distraught mother of an eighteen year old slaying victim pled Monday for Larry Fisher's defense attorney "not to drag our daughter's name through the mud".
This story could only prejudice the reader against Larry Fisher.
While we have concentrated here on the newspaper coverage, because the actual newspaper reports are a part of the record before us, it bears emphasis that the record reflects that the television and radio coverage of the proceedings against Fisher were even more extensive than those in The Meridian Star. In this connection, we note that Meridian at the time had three television stations, WTOK, WHTV and WLBM, and four radio stations, WJDQ, WMOX, *220 WOKK-WALT, and WQIC.[15] The coverage was so extensive that at the proceedings on voir dire of the prospective jurors some ten and a half months after Fisher's arrest, every one of the prospective jurors had heard of the case, a fact almost unprecedented in this Court's recent experience.

D. A Presumption, Inadequate Rebuttal, And An Abuse of Discretion

Having well in mind the nature and extent of the pre-trial publicity[16] in this case, we return to our 1916 decision in Eddins v. State, 110 Miss. 780, 783, 70 So. 898, 899 (1916). Eddins advises us that, in a case where the accused is on trial for his life, venue should be changed "when it is doubtful" that a fair and impartial jury may be impaneled in the county where the crime occurred. 110 Miss. at 783, 70 So. at 899. This approach has been applied to effect a reversal in Johnson v. State, 476 So.2d 1195. It is wholly consistent with our policy of resolving reasonable doubts in favor of one whose death the prosecution demands. See, e.g., Fairchild v. State, 459 So.2d 793, 801 (Miss. 1984); Moffett v. State, 456 So.2d 714, 720 (Miss. 1984); Williams v. State, 445 So.2d 798, 814 (Miss. 1984); Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908).
The Eddins approach, revitalized in Johnson, may be otherwise put to provide that a motion for change of venue ordinarily should be granted where, under the totality of the circumstances it appears reasonably likely that, in the absence of such relief, the accused's right to a fair trial may be lost. See Maine v. Superior Court, 68 Cal.2d 375, 383, 438 P.2d 372, 377, 66 Cal. Rptr. 724, 729 (1968). The Eddins-Johnson standard articulates and gives meaning to our oft-stated respect for the sanctity of the right of a capital defendant to a fair trial, a respect we carry so far that we guard against even the appearance of its abridgement. Mhoon v. State, 464 So.2d 77, 81 (Miss. 1985).
Practical reflection suggests the wisdom of this approach to change of venue questions in capital murder cases. The jury selection system we employ is without the capacity to determine whether the influences of substantial pre-trial publicity may be extinguished from a given juror's mind. Elementary principles of group psychology, as well as empirical findings, make clear that, where questions are put to the panel as a whole, the average potential juror will be extremely reluctant to disclose his biases. He knows that he is supposed to be fair and impartial. Knowing that, and being subject to the peer presssure of the courtroom setting (not to mention the intimidating nature of the whole experience to the first-time juror), he will be unlikely to admit that he cannot give the accused a fair hearing, even though he suspects that to be the fact. For these and other reasons, voir dire, even when most skillfully performed, is often ineffective to discover the extent to which a juror's vote may be affected by what he has heard about a case.[17]
*221 Many whose views may be substantially affected by pre-trial publicity may not know that they are incapable of sitting as fair and impartial jurors. See Comment, Fair Trial v. Free Press: The Psychological Effect Of Pre-Trial Publicity On The Juror's Ability To Be Impartial, 38 So. Calif.L.Rev. 672, 676-683 (1965). Many who allow bias and prejudice to affect their relationships with and attitudes toward their fellow man may believe quite sincerely that they are impartial and fair-minded persons. Most of us do not include among those to whom justice is due every individual within the constitution.
We are not required to leave our common sense at home when we approach judicial resolution of these questions. Common sense informs us that there may be cases where the likelihood of impaneling, in the county of a capital murder, a jury which is in fact fair and impartial is so doubtful that the prosecution should be saddled with a heavy burden of showing why venue should not be changed. In such cases "doubt" in the sense that term has been used in Eddins should be presumed, although rebuttably so. Rideau v. Louisiana, 373 U.S. 723, 726-27, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663, 665-66 (1963); compare United States v. Harrelson, 754 F.2d 1153, 1159 (5th Cir.1985).
As we said in Johnson, 476 So.2d 1195:
the accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained; such doubt is implicit where there is present strong public sentiment against the defendant; upon proper .. . [showing] there arises a presumption that such sentiment exists; and the State then bears the burden of rebutting that presumption.
This is a proper case for the application of such a presumption. Every juror called had heard about the case. Concededly, the average citizen forgets the details of media news reports. Here the Lauderdale County area was bombarded with "news" reports of the Weathers and Formby murders and the Larry Fisher prosecution for months. Television stations and radio stations joined the local newspaper, The Meridian Star, in this effort. The inescapable cumulative impact of all of this pre-trial publicity was a firm and definite impression upon the mind of the average citizen that Larry Fisher had raped and murdered both Formby and Weathers. If there was a single media report favorable to Fisher or telling his side of the case, it has not been brought to our attention.
Our emphasis here is not placed merely upon the quantity of pre-trial publicity this case received. We are equally concerned with the content of such coverage, its quality, if you will. Critically important here is the repeated reporting of the evidence against Fisher, of evidence not admissible at trial (principally evidence of Fisher's connection with the Formby rape-murder and the Rivers rape) and that Fisher was a previously convicted sex offender. This is the sort of setting where, as a matter of common sense, Larry Fisher entered the trial facing a very real burden of proving his innocence. The opinions offered by four law enforcement officers and two news reporters hardly rebut the presumption thus created.
It is true that the great majority of those called for jury service nevertheless insisted that they could give Larry Fisher a fair trial and would set aside what they had learned through the news media and heard otherwise about the case. All twelve of those seated so proclaimed.[18] No doubt these jurors were responding in good faith and no doubt the trial judge accepted their responses in good faith. The saturation *222 pre-trial publicity described above, however, suggests that there was and remains substantial doubt that Larry Fisher could then or ever get a fair trial in Lauderdale County.
The trial judge's error lies in substantial part in his failure to regard as creating a presumption that venue should be changed the fact that the Lauderdale County citizenry had been bombarded with anti-Larry Fisher media publicity for almost a year. Where the pre-trial publicity has been as extensive and as unfavorable to the defendant as was the case here, "he-can-get-a-fair-trial-here" opinion testimony from a handful of public officials or law enforcement officers will almost never be sufficient to rebut the Johnson presumption.[19]
The trial judge further erred in accepting at face value the assurances of the jurors impaneled that they could ignore what they had read and heard and give Larry Fisher the fair trial that was and is his right. In analogous contexts, the Supreme Court of the United States has repeatedly emphasized the fallibility of the juror's oath. It has cautioned against giving "dispositive" effect to jurors' sworn statements that they could and would ignore pre-trial publicity. Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 614 (1966); Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751, 759 (1961).
In Groppi v. Wisconsin, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971) the Court has reminded us that the
problem is an ancient one. Mr. Justice Holmes stated no more than a commonplace when, two generations ago, he noted that `[a]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere.' Frank v. Mangum, 237 U.S. 309, 349, 59 L.Ed. 969, 989, 35 S.Ct. 582 [595] (dissenting opinion).
400 U.S. at 510, 91 S.Ct. at 493, 27 L.Ed.2d at 575.
Long before Sheppard and Irvin, this Court had recognized that the mere impaneling of twelve jurors who deny any bias or prejudice and swear to try the case on the law and the evidence is not sufficient to afford one criminally accused of his right to a fair trial. As stated by this Court in Seals v. State:
A fair trial means more than that. It means, in addition to the right to be tried by such individual jurors, the right to be tried in an atmosphere in which public opinion is not saturated with bias and hatred and prejudice against the defendant[20]; where jurors do not have to overcome that atmosphere, nor the later silent condemnation of their fellow citizens if they acquit the accused.
208 Miss. at 249, 44 So.2d at 67.
To put the point another way, Magness v. State, 103 Miss. 30, 60 So. 8, 10 (1912), holds that:
The requirement of the law is not satisfied by the mere impaneling of twelve men against whom no legal complaint can be made.
Seals v. State, 208 Miss. at 248, 44 So.2d at 67.
A decade later Keeton v. State, 132 Miss. 732, 96 So. 179 (1923) reaffirmed that it is not enough that
12 unbiased men may be found in the county to try him. The statute contemplates that the jury shall not only be composed of unbiased and impartial men, but of men who have not been subject to the influence of a popular demand for the defendant's conviction.
132 Miss. at 738, 96 So. at 180.
Any doubt of the vitality of Seals, Magness and Keeton has been removed by our decision in Johnson v. State.
*223 We return to where we began. We are concerned with Larry Fisher's fundamental right to a fair trial, for "[o]nly impartial trials can pass the Red Sea of this Court without drowning". Hampton v. State, 88 Miss. 257, 259, 40 So. 545, 546 (1906). We are convinced that the trial judge scrupulously respected Fisher's right to a fair trial in all matters save one, one without which the rest are rendered meaningless. The facts recited above are substantially convincing to our minds that no jury could be impaneled in Lauderdale County which could bring to Larry Fisher's trial that degree of fairness and impartiality which is his right. Certainly on this record there was in February of 1984 and again in April, 1984 a reasonable likelihood that, without a change of venue to a county outside the coverage of the Meridian news media, Fisher could not be afforded his constitutionally assured fair trial. Applying further the Eddins-Johnson test, the evidence of saturation media publicity  including the content of that publicity  was sufficient to give rise to a rebuttable presumption in law that there was a reasonable likelihood that Fisher could not get a fair trial in Lauderdale County. The opinion testimony of four law enforcement officers and two media representatives (the latter of whom had created the problem in the first place) was insufficient to rebut the presumption. Viewing the trial as a whole, Winters v. State, 473 So.2d 452, 457 (Miss. 1985), our conclusion remains the same.
To reiterate what we said almost seventy years ago in Eddins v. State, 110 Miss. 780, 70 So. 898 (1916),
The right to trial by an impartial jury is guaranteed by the organic law of the state, and when it is doubtful that such a jury can be obtained in the county of the venue of the homicide, the person on trial for his life is but asking for his rights when he requests a change of venue, and there is no imaginable reason to refuse, except, possibly, a slight additional cost to the county.
110 Miss. at 783, 70 So. at 899.
In summary, we hold that venue of this case should have been transferred to a county substantially outside the coverage area described above.[21] Accordingly, the trial judge abused his discretion when he denied Fisher's motion for change of venue. We reverse and remand with instructions that venue be so transferred and that thereafter there be a new trial on all issues.
In holding as we do, we make no marked departure from the approach we have taken to such issues in recent years in cases such as Cabello, West and Billiott. Rather, we reiterate as we did in Johnson that requests for change of venue implicate a constitutional right and that the approach to these questions found in Eddins and Magness and Keeton and Seals, decided and reiterated over a 37 year period of time, is also very much alive and well and a part of our law.

E. A Procedural Note

A final point regarding the trial judge's handling of the change of venue issue that requires comment. The hearing on Fisher's motion was held February 2, 1984. The trial judge did not rule at the conclusion of this hearing but rather took the matter under advisement pending voir dire examination of the jurors called for trial. We have observed this practice in other cases and believe comment is in order.
Absent unusual circumstances, the trial judge should rule on the motion at the conclusion of the venue hearing and in any event prior to the summoning of the prospective jurors for trial. If as here the evidence offered at the venue hearing creates a substantial doubt whether this defendant can receive a fair trial before a Lauderdale County jury, the trial judge should so rule and not wait to see if voir dire of the prospective jurors may cure his doubts. To be sure, if a motion for change *224 of venue has been denied and if on voir dire the trial judge becomes of the opinion that his earlier ruling was in error, he has the authority to reverse himself and grant a change of venue, upon the renewed motion of the defendant or sua sponte. But this does not justify the trial judge in not ruling when the matter is originally heard.
We acknowledge that several of our prior cases "accept" this procedure without criticism. See, Murphy v. State, 453 So.2d 1290, 1292 (Miss. 1984); Gilliard v. State, 428 So.2d 576, 579 (Miss. 1983). We are not here saying that the procedure will be held reversible error. Still, the accused is entitled to a ruling on his motion prior to the time when the trial judge "knows" that there are sitting in the courtroom at the county's expense dozens, if not hundreds, of prospective jurors. Our observations above regarding the problem of unmasking juror bias coupled with the legal approach from Seals, Magness and Keeton also militate against waiting for trial before ruling in the first instance on a motion for change of venue.

VI. Closing Argument To The Jury

Although as explained above, we reverse, a number of matters raised by Fisher's assignments of error appear reasonably likely to recur on retrial. Because of this and because the points were fully litigated below and have been properly assigned and briefed here, it is our responsibility to address them now to the end that the risk of error on retrial may be minimized. See, West v. State, 463 So.2d 1048 (Miss. 1985); Jones v. State, 461 So.2d 686 (Miss. 1984).
Fisher charges that the trial court erred in failing to grant a mistrial when the district attorney, in closing argument, made reference to another charge against Larry Fisher, namely the charge of raping Pat Rivers.
It will be recalled that there was pre-trial publicity regarding Fisher's alleged rape of Pat Rivers. Indeed, on December 1, 1983, an indictment was returned by the Lauderdale County Grand Jury charging Fisher with the Rivers rape. No trial has ever been held and the matter remains pending on the docket of the Circuit Court.
Our rule is well established and familiar that the issue in a criminal prosecution is singular and that the defendant shall not, without his consent, be tried at the same time for more than one offense. See Stinson v. State, 443 So.2d 869 (Miss. 1983). More to the point, under our law the prosecution is prohibited from introduction of evidence that the defendant is guilty of an offense other than that charged in the indictment. See, e.g., Tobias v. State, 472 So.2d 398, 400 (Miss. 1985); Hughes v. State, 470 So.2d 1046, 1048 (Miss. 1985); West v. State, 463 So.2d 1048, 1051-52 (Miss. 1985).
Although at the time of this trial indictments against Fisher were outstanding not only for the Rivers rape but also for the Formby capital murder, the record reflects that the trial judge scrupulously respected the rules and kept from the jury evidence of these other charges. Nevertheless, Fisher claims that the rule was offended by the prosecuting attorney in his closing argument. In this regard, the record contains the following:
BY MR. WRIGHT:
Let's see what they begin to uncover. Because this person hides. He hides in the cover of darkness. He hides when he preys on women. He hides when he takes advantage of the weak. He hides behind the indignation of a rape victim, the horrors of coming forward and saying what happened and who did it.
* * * * * *
BY THE COURT:
Yes, sir. Your request for a Special Bill of Exceptions is granted. Your objection is overruled; your Motion for a Mistrial is overruled.
(R. 1383)
Fisher assigns as error the trial judge's refusal to grant a mistrial.
In our view, this argument in no way places Fisher on trial for a crime other than that with which he has been charged in the instant indictment. Rather, the prosecuting *225 attorney is attempting to describe for the jury in less than complimentary terms the sort of person who would commit the sort of crime involved in this case. This is a perfectly legitimate final argument. See Edwards v. State, 441 So.2d 84, 89 (Miss. 1983); Johnson v. State, 416 So.2d 383, 391-92 (Miss. 1982); Gray v. State, 351 So.2d 1342, 1346 (Miss. 1977); Clemons v. State, 320 So.2d 368, 371-72 (Miss. 1975). This assignment of error is without merit.

VII. The Necklace As Evidence

Fisher next argues that the trial court erred in admitting into evidence the necklace found in Fisher's truck on July 13, 1983, five weeks after the police had arrested him. Fisher's argument is essentially a chain of custody argument which we regard as being without merit. The evidence reflects that Fisher's truck remained on the sheriff's parking lot for some five weeks. It was released to his mother who took it to Nelson Hall Chevrolet whereupon the same day the second Marlboro cigarette box which contained the necklace was found by an employee. All of this is more than sufficient to confirm to any chain of custody requirement which may be applicable. See Lambert v. State, 462 So.2d 308, 312-13 (Miss. 1984); Morris v. State, 436 So.2d 1381, 1388 (Miss. 1983).
Defense counsel quite properly brings considerable skepticism to the discovery of this second Marlboro cigarette box. It is difficult to believe that the cigarette box was where Mr. Mansour said it was  wedged between the steering column and the dashboard  and not found by the law enforcement officials at the time of their original searches in early June, 1983. Still, Fisher's objections here go to the weight and credibility to be accorded this evidence, not its admissibility. The assignment of error is denied.

VIII. Subpoena For Out Of State/In Custody Witness

Fisher next argues that the trial court erred in not granting a subpoena for an out of state witness. What happened here is that the defense sought to call a witness, one Robert Alexander, who at the time was in Federal custody. The defense suggested that the witness would have testified that he knew Melinda Gail Weathers; was familiar with her drug habits because he personally supplied her drugs (cocaine) in large quantities; and that she was probably involved in peddling it because the quantity supplied was too large for her personal use. He had supposedly furnished her a large quantity around the time of her disappearance and subsequent murder.
The trial judge denied the requested subpoena and observed that the testimony would not be admissible even if the witness were to appear. The trial judge so suggested in the face of defense arguments that this evidence would present another reasonable hypothesis on the identity of the killer or killers.
The point may be answered quickly. In a homicide prosecution such as this, the character and reputation of the deceased are not issues.[22]Shinall v. State, 199 So.2d 251, 257 (Miss. 1967); Spivey v. State, 58 Miss. 858, 864-66 (1881). That a person may be a drug dealer, drug user or garden variety drunk in no way operates as a waiver of that individual's entitlement to the benefit of our laws protecting individuals against personal injury and wrongful death. See Hammond v. Grissom, 470 So.2d 1049, 1054 n. 3 (Miss. 1985); Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983). Furthermore, on the showing made, the defense proffer put in the light most favorable to Larry Fisher was nevertheless rank speculation and innuendo not admissible in evidence. The assignment of error is without merit.

IX. On The Responsibilities Of A Free Press  And The Consequences Of Press Irresponsibility

One final point needs to be mentioned. On Monday, April 24, 1984, following the *226 conclusion of Fisher's trial, The Meridian Star discussed the matter in an editorial. The Star opined that the verdict and sentence were correct and made clear its opinion that Fisher was also guilty of the Formby rape-murder but that he likely would not be tried for that one "due to the fact that he can only die once". Then The Star editorially lamented the appeals certain to follow and noted "execution is by no means a certainty".
This Court venerates the ideal and reality of a free press. We take a back seat to no one in our determination that the rights vested in the press by the federal and state constitutions will be wholly respected. See, e.g., Ferguson v. Watkins, 448 So.2d 271 (Miss. 1984); Gulf Publishing Co., Inc. v. Lee, 434 So.2d 687, 695 (Miss. 1983); Edmonds v. Delta Democrat Publishing Co., 230 Miss. 583, 93 So.2d 171 (1957). In Johnson we affirmed the trial judge's refusal to "gag" none other than The Meridian Star. We only wish The Star had been equally concerned with Larry Fisher's equally important right to a fair trial  and that The Star will respond responsibly to the fact that its failure to respect Fisher's rights is a major reason for delay in this capital murder prosecution against Larry Fisher and for uncertainty as to its outcome.
REVERSED AND REMANDED WITH DIRECTIONS FOR CHANGE OF VENUE
PATTERSON, C.J., and DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
ROY NOBLE LEE, WALKER, P.JJ., and HAWKINS, J., dissent.
ROY NOBLE LEE, Presiding Justice, dissenting:
I have conducted a thorough review and study of the record pertaining to the motion for change of venue, which includes testimony, exhibits, voir dire of the jury, and opinion of the trial judge, and, in my opinion, the trial judge did not abuse the exercise of sound discretion and did not commit reversible error in overruling the motion for change of venue. Further, I am convinced that the jury selected was untainted, unbiased and unprejudiced, and that Fisher received a fair trial. Therefore, I dissent from the majority opinion reversing and remanding this case because of the court's refusal to sustain the motion for change of venue.
The victim was reported missing on May 4, 1983. Her body was found four days later on May 7, 1983. Fisher was apprehended June 4, 1983, by the use of a female "decoy". On December 1, 1983, he was indicted for capital murder and on April 16, 1984, the motion for change of venue was heard and overruled. The trial proceeded on its merits April 20, 1984, which resulted in Fisher's conviction for capital murder and the imposition of the death penalty.
During the early investigative stages of the case, a great deal of publicity was given to the matter, but that publicity diminished as time passed and as the time for trial grew closer. It is a matter of common knowledge that people's memories are short about news items through the newspapers and television, and radio, and, after a few months they may recall that the incident did occur, but facts of the case have passed out of their minds. Except for the murder of Oswald, probably no case has ever received more publicity, all through the newspapers, television and radio, than the attempted assassination of President Reagan by Hinkley. Probably ninety-five percent (95%) of the people in the United States actually saw the attack on the president, yet, the court experienced no great difficulty in impaneling a jury which was not biased and prejudiced against the defendant. In fact, after all the publicity, the jury found Hinkley not guilty.
In the case sub judice, the trial judge thoroughly voir dired the jury himself and permitted unlimited voir dire by the attorneys. At the evidentiary hearing, three (3) witnesses, one of whom was Fisher's mother, testified that, in their opinions, appellant could not obtain a fair trial in Lauderdale *227 County. Seven (7) witnesses, two (2) of whom were from the news media, testified that, in their opinions, the appellant could receive a fair trial in Lauderdale County. The State exercised eleven (11) peremptory challenges and the defendant exercised only seven (7) challenges. Nineteen (19) qualified jurors remained after the jury was selected. An essential part of the judge's opinion on the motion for change of venue follows:
Jurors 40, 42, 43, 44, 45, 46, 47, 48, 51, 52, 53, 54, 55, 56, 57, 59, 60, 61 and 63 were not needed for the selection of the jury, though they were available. And for that reason, the reason stated before, the Court feels that both the State and defendant can and will have a fair and impartial trial at the hands of 12 jurors who have no desire to see the case go for or against the State or for or against the defendant. And the Court feels and is convinced that the jurors including the alternates can and will listen to all the evidence, follow the instructions of the Court, and render a just and fair and honest verdict. For those reasons the Court overrules and denies the request for a change of venue to some other county in the State of Mississippi. I'll ask this jury list that I used to strike the jury which reflects what I had to say be made Exhibit A for Identification and be made a part of the record.
The criminal courts have always upheld the principle and standard that the matter of a change of venue is in the sound discretion of the trial judge and that he will not be faulted or placed in error except for an abuse of that sound discretion. West v. State, 463 So.2d 1048 (Miss. 1985); Billiot v. State, 454 So.2d 445 (Miss. 1984); and precedent for more than a hundred years. Cases involving the news media, which have been reversed for refusal to change venue, are Johnson v. State, 476 So.2d 1195 (Miss. 1985); and Stevenson v. State, 325 So.2d 113 (Miss. 1975), a pre-Jackson v. State case [337 So.2d 1242 (Miss. 1976)]. Other cases cited by the majority opinion involve mob violence, threats of lynching, biased feelings of the populace, victims who were prominent and influential people, and victims who were relatives of law enforcement officers. See my dissenting opinion on this question and discussion of the authorities cited in the majority opinion, together with appendixes, in Johnson v. State, supra.
Applying the principle and standard of law enunciated for more than a century relating to change of venue in criminal cases, I am convinced that the trial judge here did not abuse his sound discretion in refusing to change the venue, that he did not commit reversible error, and that the appellant received a fair trial. In my opinion, the effect of Johnson v. State, supra, and today's majority decision, shackle the criminal law and the enforcement thereof, without adding anything to the defense. Therefore, I dissent from the majority opinion.
WALKER, P.J., and HAWKINS, J., Join this dissent.
NOTES
[1] Fisher testified that he remained in his truck until confronted by the detective with his gun. Detective House testified that Fisher approached the decoy car and "was going straight for the decoy driver".
[2] Defendant Fisher nor his attorneys at any time challenged the legality of the searches conducted by the law enforcement officers. Suffice it to say that all searches are either incident to arrest or warranted.
[3] S.A. Thomas had testified earlier that he had seen the box and a cigarette lighter in the front seat the night of the arrest.
[4] This search resulted in the recovery of hair samples from the passenger side of the truck, later determined to be Larry Fisher's.
[5] Detective Thomas had also testified to searching under the dash both by visual inspection and by reaching underneath the dash.
[6] This earring was a mignon fuge that Melinda's mother testified to as being exclusive and was only carried by Heritage, a concern that was open for business in Meridian for two years but has since closed.
[7] For the sake of clarity, there were two shop rags involved in this case (similar in appearance, weave and design but not identical); one was found between the legs of the victim when the body was discovered and another was found in Larry Fisher's truck when the truck was being searched. The rag from which the hair samples were taken was the one between the legs of the victim.
[8] There is no explanation in the record as to how such a crucial piece of evidence could have escaped detection by law enforcement personnel after four extensive and supposedly thorough post-arrest searches.
[9] Two necklaces, one belonging to Fisher and one to his mother, were admitted into evidence in order to test the witness' identification of the Marlboro necklace.
[10] As all know, a comparable right is secured to one criminally accused by the Sixth and Fourteenth Amendments to the Constitution of the United States. See Johnson v. State, 476 So.2d at 1209, and cases cited therein.
[11] Lauderdale County has a population of 77,285 (1980 census). The Meridian Star has a circulation of 24,141 daily and 26,991 on Sundays. (1985 IMS/AYRE Directory of Publication; p. 550, IMS Press.Pub.Fort Washton, PA.
[12] The issues of The Meridian Star from June, 1983 through January, 1984 are made exhibits and are formally a part of the record. The May, 1983 and April, 1984 issues of The Star have been examined by the Court. The facts of the publication and circulation of these newspapers (as distinguished from the truth of the contents thereof) are within the judicial knowledge of the Court. See, State v. Hobbs, 282 S.E.2d 258, 274 (W. Va. 1981); Jackson v. Godwin, 400 F.2d 529, 536 (5th Cir.1968).
[13] See discussion in the statement of the facts in Section II(A) at pages 208-209, supra, and in Section VII infra.
[14] See Fisher's Assignment of Error No. 6, discussed in Section VIII of this opinion below.
[15] See discussion in Johnson v. State, 476 So.2d 1195.
[16] A point should be noted here. Unlike many other change of venue cases, we have not been presented the usual parade of community citizens giving their opinion as to whether the accused would get a fair trial in his home county. Here Fisher's mother and his former attorney gave opinions that he could not get a fair trial in Lauderdale County. Three law enforcement officers and two reporters opined to the contrary.

To be sure, such opinion evidence is admissible on change of venue hearings. Accumulated, it can be persuasive. Johnson v. State, 476 So.2d 1195. Resorting to common sense, however, we may only conclude that such opinions are by their very nature among the more unreliable evidence we allow in any context. To a large extent the witness is being asked to give an opinion regarding a fact he or she cannot possibly know. Particularly in the context of the saturation pre-trial media publicity brought to our attention, the sparcity of citizen opinion testimony becomes a near irrelevancy.
[17] The conclusory statements made in the above paragraphs of this opinion are predicated upon extensive professional research and investigation. See generally, Suggs and Sales, Juror Self-Disclosure In The Voir Dire: A Social Science Analysis, 56 Ind.L.J. 245 (1981); Fahringer, In The Valley Of The Blind: A Primer On Jury Selection In A Criminal Case, 43 Law & Contemp.Prob. 116 (1980); Broeder, Voir Dire Examinations: An Empirical Study, 38 S.Calif.L. Rev. 503, 528 (1965). A current summary of the conclusions contained in the literature on the subject may be found in Vinson, Confronting Juror Bias: A Behavioral Science Perspective, 27 DEFENSE (Defense Research Institute) 14 (1985).
[18] The four jurors who were excused for cause each indicated that their bias resulted from their acquaintance with the Weathers family.
[19] The pre-trial media publicity here was more extensive in the Meridian and Lauderdale County area than that found sufficient to require reversal in Johnson.
[20] The front page stories in The Meridian Star during the trial reflect substantial hostile community feelings toward Fisher at that time.
[21] Fisher's motion for change of venue effectively waives his right to trial in the county where the crime occurs. See Miss. Const. Art. 3, § 26 (1890); see also, U.S. Const. Amndts. VI and XIV.
[22] See also, Rule 404(a)(2), of Mississippi Rules of Evidence, effective January 1, 1986. Though the Rules were not effective at the time of this trial, Rule 404(a)(2) merely codifies the common law rule stated above.