IN THE SUPREME COURT OF MISSISSIPPI

NO. 92-CT-00976-SCT

*BRIAN CLAYTON HICKSON*

*v.*

*STATE OF MISSISSIPPI*

<u>ON PETITION FOR WRIT OF CERTIORARI</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 08/20/92 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. BOYCE HOLLEMAN |
| | TIM C. HOLLEMAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOLENE M. LOWRY |
| | BY: WAYNE SNUGGS |
| DISTRICT ATTORNEY: | JEANNENE T. PACIFIC |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/15/97 |
| MOTION FOR REHEARING FILED: | 1/12/98 |
| MANDATE ISSUED: | 4/2/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This matter is before the Court on petition for certiorari from the Mississippi Court of Appeals. This Court granted petitioner's writ of certiorari to determine whether pre-trial media publicity warranted a change of venue, whether the jury improperly considered extraneous information during deliberations, and whether rebuttal testimony was impermissibly admitted into evidence.[1] Because we find that venue should have been changed, evidenced in part by the comment made during jury deliberations concerning other charges against the petitioner, we reverse and remand.

**I.**

¶2. On September 04, 1990, Tina Wigington, the secretary of the Indian Springs Baptist Church located near Laurel, Mississippi, was in her office when a man came in and asked for assistance in locating a cemetery plot. Tina explained that the cemetery was not owned by the church, but she

gave him directions to the house of the man who managed the cemetery. As the man left the church, Tina glanced out the window as she had not heard nor seen a car drive up. Finding no car, she assumed that the man parked at the cemetery and walked to the church after he could not find the cemetery plot. Shortly after Tina resumed her work, she looked up to find the man standing before her again. He asked her to repeat the directions to the cemetery manager's home. As she started to answer, the man pulled out a gun and held it to Tina's head. He told her to do as he instructed her. He then took her into the pastor's office and pushed her down on her knees. Tina offered the man her jewelry and begged him not to kill her as she had a daughter. The man told her that as long as she did as he instructed, he would let her live. He pulled down his clothing and ordered her to perform fellatio. Tina refused. The man then pulled down Tina's clothes and raped her anally. As he was leaving, he threatened to kill her and do to her daughter what he had just done to her if she told anyone about the assault. Tina promised that she would tell no one.

¶3. As soon as the man left, Tina called 911. She was subsequently taken to the hospital where a rape kit was completed and then to the police department where she provided a statement and a description of the rapist, from which a composite was created. A few weeks later, Tina drove to Hattiesburg and met with a police officer who used Tina's description of the man to draw a more becoming sketch of her assailant.

¶4. During the course of the investigation, police arrested a local resident who had previously been arrested for public indecency. The man was released following a comparison of his blood, saliva, and hair samples to the evidence collected from the rape kit and the scene of the crime, along with Tina's conclusion that the suspect was not the man who raped her. Then on October 26, 1991, approximately fourteen months after the offense, Tina, her daughter, her sister, and her sister's infant baby went to the Arts and Crafts Festival in Ellisville. Tina left her daughter and sister to purchase a ring for her daughter at one of the booths. As she walked back toward her family, Tina saw the petitioner, Brian Clayton Hickson. According to testimony from Tina and her sister, Tina reacted as if she had seen a ghost.[2] Tina's sister asked her what was wrong, but Tina, not wanting her daughter to know, replied that nothing was wrong. She then asked her sister to take the children and wait for her in the car. Her sister, however, refused to go anywhere unless Tina told her what was going on. Tina finally told her sister that she had just seen the man who raped her. She then pointed Hickson out to her sister and told her sister that she was going to follow him. Her sister decided it would be safer for her to follow Hickson instead. Thus, the sister followed Hickson, who was accompanied by his wife and three children, to their car where she wrote down a description of the car and the license plate number.

¶5. Tina and her sister immediately left the festival and went to the sheriff's department in Ellisville where she reported the identification. After running the vehicle information, it was discovered that the car belonged to Hickson. This information was passed on to the local sheriff's office. When Tina went home, she went to the Laurel Police Department and gave another statement about the identification. She was positive that the man she identified at the fair was the man who raped her on September 04, 1990. Based upon this information, a police officer went to the house of Hickson's mom and asked where Hickson lived. Shortly thereafter, several police officers went to Hickson's home and arrested him.

¶6. Prior to the trial, counsel for Hickson moved for a change of venue. He argued that a fair and

impartial trial could not be had in Jones County as there had been a large amount of media publicity concerning the case and Hickson's involvement.

¶7. The following three television news reports were aired shortly after Hickson's arrest:

(1) A Jones County man, Bryan (sic) Clay (sic) Hickson, has been arrested and charged with an alledged (sic) rape at Indian Springs Baptist Church a year ago. Jones County Sheriff Department investigators say Hickson was picked up at his home Saturday... after he was identified by a woman who alledged (sic) Hickson raped her.

(2) A Jones County woman enjoying an Ellisville fall festival Saturday with her sister spotted a man she says raped her a year ago. Bryan (sic) Clay (sic) Hickson was picked up at his Sandersville home Saturday . . . after the woman identified Hickson as the man who allegedly (sic) raped her on her job at Indian Springs Baptist Church... The case is expected to come up in January's grand jury hearings.

(3) Sheriff Deputies have jailed a man they believe raped a woman at a rural Jones County Church. Bryan (sic) Clay (sic) Hickson was arrested at his home Saturday... after he was identified by a woman who charged Hickson raped her at Indian Springs Baptist Church over a year ago. Jones County Sheriff Department investigators say the alleged victim spotted Hickson at a fall festival in Ellisville over the weekend.

¶8. In addition, there were several front page newspaper articles written about the case in the local newspaper, the *Laurel Leader-Call*. On October 29, 1991, the front page headline read, "Man jailed for rape at church." Below the headline was a photograph of Hickson beside the composite that was put together when Tina initially reported the assault. The story recites the events surrounding Tina's identification of Hickson at the Ellisville festival, as well as the fact that Tina picked Hickson out of a photo lineup the afternoon after Hickson was arrested.[3] On October 30, 1991, there was a front page follow-up, "Rape suspect free on bond." On November 22, 1991, the same newspaper printed another story, "Motion filed on bond in Indian Springs Case," which included a reprint of a portion of the State's motion to reinstate bond: " . . . and that the defendant threatened to kill (the victim) and her child if she ever reported that the defendant committed the crime as alleged...."

¶9. The December 06, 1991 edition of the local paper included another front page story about the case, "Attorneys agree on Hickson bond," as did the January 25, 1992 edition, "Rape suspect arrested again." In this particular article, it was reported that Hickson had been arrested and charged with committing another, separate sexual battery that occurred on January 28, 1990. The facts of that sexual battery were related in the article, as well as a statement by a member of the Laurel Police Department that Hickson's arrest in the instant case is what led to his arrest for the other sexual battery. There was another article in the paper, "Trial dates set for Circuit Court," which informed the community that Hickson's trial in the instant matter was scheduled to begin on August 17 and that he faced another sexual battery charge which had not yet been scheduled for trial.

¶10. In light of Hickson's affidavit-supported motion for change of venue, the trial court held a hearing. At the hearing, the State presented seven members of the community in support of its position that Hickson could receive a fair and impartial trial in Jones County. All of the State's witnesses admitted that they knew about the incident and that they had watched the television reports

and read the newspaper articles concerning the matter. In addition, five of the seven witnesses stated that they had either discussed the matter or listened to or overheard discussions about it. Despite their exposure to the case, however, all of the State's witnesses testified that they could be fair and impartial and that they did not think the community had prejudged Hickson or was biased against him.

¶11. The defense called six witnesses in support of its motion to change venue. Of the six witnesses, two knew Hickson, one was related to him, and one (an investigator) worked for his attorney. Four of the six witnesses had read about or watched the media coverage of the case. All of them testified that they had discussed the matter, and all of them opined that they could not be fair and impartial (except the investigator who was not asked this question) and that the community had prejudged Hickson guilty and was biased against him.

¶12. The trial court reserved his final ruling on the change of venue motion until after voir dire. During voir dire, it was discovered that forty-seven of the eighty-six venire members had either read the newspaper articles or seen the television stories about this matter. Several of the forty-seven panelists admitted to discussing the case among themselves.

¶13. Of the twelve members of the jury that adjudged Hickson guilty, eleven had either read the articles, seen the news reports, or been exposed to both.[4]

¶14. Following voir dire, counsel for Hickson reurged his motion for change of venue attaching a copy of the voir dire list with the names of all jurors who stated that they were exposed to the pre-trial publicity. The State argued that venue should remain in Jones County and did not need to be changed as each of the jurors had unequivocally stated his or her ability to be fair and impartial and to put aside what had been read or seen in the media. The judge overruled the motion for change of venue.

¶15. A trial proceeded at which the State put on evidence that tests of a rectal swab indicated the person who deposited the semen was an O blood type secretor. Hickson's blood and saliva tests indicated that he was an O blood type secretor.[5] Thus, the seminal fluid evidence did not exclude Hickson as the rapist. There was also evidence that the pubic hairs that were found at the scene of the crime were comparable to pubic hairs pulled from Hickson, but were *not* comparable to hairs pulled from the victim. In addition, Tina's stepmother, Hilda Houston, who was employed at the Jitney Jungle, testified that one day in December 1990, Tina and her daughter came into the deli of Jitney Jungle to eat lunch. As Tina went through the deli line, she and Houston chatted. Hickson, who had been employed as a stock clerk at the store for about two weeks previously and whom Houston had talked to briefly about a week prior to this day, approached Houston after Tina and her daughter left the deli and asked who the dark-haired young lady was with whom Houston had talked. Houston told Hickson that Tina was her stepdaughter and asked why he wanted to know. Hickson replied that he thought he knew Tina. Houston testified that after this conversation she never saw Hickson at the grocery store again. A manager of the grocery store testified that Hickson worked at Jitney Jungle from December 6th through the 14th of December. Hickson told the manager that an old knee injury was aggravated by his standing on the concrete floor.

¶16. Hickson argued, via his testimony and that of his family, that he was innocent. He claimed that he did not match the description given by Tina of the rapist because he was sporting a full-grown

beard and mustache around the date of the rape and Tina had not included that feature in her description or the composite.[(6)] Hickson further claimed that he was at home during the assault babysitting his toddler daughter. His mother testified that she called Hickson at approximately 10:30 a.m. to determine if he had seen the news flash about the rape, and his wife testified that Hickson called her at approximately 11:00 a.m. and told her to be careful as the man was reported dangerous and still at large.

¶17. The State maintained that none of the defense witnesses accounted for Hickson's whereabouts during the actual time of the rape, which occurred at about 9:00 a.m. The State also presented evidence that it only took between twenty-one and twenty-seven minutes to get from Hickson's house to the Indian Springs Church.

¶18. Based upon the evidence presented, the jury found Hickson guilty as charged. Hickson filed a motion for new trial, arguing among other things jury misconduct during deliberation. He called three jurors as witnesses under Miss. R. Evid. 606(b), alleging that extraneous prejudicial information was improperly brought to the jury's attention. The three jurors testified that during deliberations an unidentified juror asked, "Has anybody heard of any other charges being brought against Clay?"[(7)]

¶19. The trial court summarily denied Hickson's motion for new trial. Hickson then appealed to the Court of Appeals. That court rejected Hickson's claims, concluding that the pre-trial publicity in this case and the voir dire of the jury demonstrated that the trial court did not err in failing to transfer venue as there was no proof that the atmosphere toward Hickson in Jones County had been poisoned by the coverage and because the jury members unanimously stated that they would be fair and impartial in the case. Concerning the question about other charges during jury deliberations, the Court of Appeals concluded that no evidence was presented which demonstrated that the nature of the "other charges" against Hickson had been discussed (whether the charges were criminal or not) or that the other charges might suggest his guilt in the instant case. Furthermore, that court decided that the foreman properly staved off discussion of the issue of other charges and directed the panel to focus on the evidence and charge before it.

¶20. Aggrieved, Hickson petitioned for certiorari to this Court. We granted certiorari and now address the issues alleged by him.

## II.

**THE COURT OF APPEALS DECISION REGARDING THE CHANGE OF VENUE ISSUE IN THIS CASE WAS ERROR.**

**THE CONSIDERATION BY THE JURY, DURING DELIBERATIONS, OF THE OTHER CRIMINAL CHARGE AGAINST HICKSON WAS ERROR AND WAS HIGHLY PREJUDICIAL TO HICKSON.[(8)]**

¶21. One of the fundamental hallmarks of our legal system is an accused's right to a fair trial before an impartial jury, secured in this state by Miss. Const. Art. 3, §§ 14 and 26 (1890). "[C]ourts [must] guard against even the appearance of unfairness" in terms of impaneling an impartial jury. *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1985). "Because on appeal [this Court] . . . defer[s] to jury

determinations of fact questions [and disputes], we must be vigilant that the jury making such findings [and resolving such disputes] is infected by not the slightest taint or suggestion of bias or unfairness." *Fisher v. State*, 481 So. 2d 203, 216 (Miss. 1985).

¶22. Where a defendant presents the court with an application for change of venue accompanied by two affidavits which affirm the defendant's inability to receive a fair trial in a particular location, a presumption is created that it is impossible for a fair trial to be had in that place. *Holland v. State*, No. 93-DP00494-SCT, 1997 WL 562038, at *23 (Miss. Sept. 11, 1997) (*citing Porter v. State*, 616 So. 2d 899, 905 (Miss. 1993)). This presumption may be rebutted if the State proves from voir dire that the trial court impaneled an impartial jury. *Holland*, 1997 WL 562038, at *23 (*citing Harris v. State*, 537 So. 2d 1325, 1329 (Miss. 1989)). If the State makes such a showing of impartiality, this Court defers to the trial court's denial of the change of venue request, even in the face of adverse publicity, for the venue decision is, after all, within the discretion of the lower court. *Holland*, 1997 WL 562038 at *23; *Harris*, 537 So. 2d at 1329; *Fisher*, 481 So. 2d at 215.

¶23. This Court has noted, nonetheless, that although the venue issue "is committed to the trial judge's *sound* discretion," it is not left up to his unfettered discretion. *Fisher*, 481 So. 2d at 215 (emphasis in original). There, this Court stated that:

> The sound exercise of the discretion vested in the trial judge when faced with a motion for change of venue must be informed by the evidence presented at the venue hearing coupled with the trial judge's reasoned application of his sense of the community and, particularly in a case such as this [capital murder], an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of a community.

*Id.*

¶24. There are limitations on a trial court's decision not to grant a venue change, such as where there has been adverse and prejudicial pre-trial publicity of such a magnitude and quality that a fair trial could not be had in a particular venue. *Holland*, 1997 WL 562038, at *23 (*citing Johnson v. State*, 476 So. 2d 1195, 1211 (Miss. 1985)). In *Johnson v. State*, this Court recognized that "the matter of extensive media exposure . . . is however a most important element to be considered relative to a change of venue." *Johnson*, 476 So. 2d at 1214. It was further noted that "the media [is] all-pervasive in this day and age" and that "[n]ewspapers and news broadcasts shape every community's understanding of itself [as well as] public opinions and attitudes . . ." *Id.* Moreover this Court aptly acknowledged that "[s]eparate crimes which should be tried individually can become inextricably intertwined in print and over the airways." *Id.* at 1215. Recognizing that pre-trial media publicity can unfairly prejudice an accused and interfere with his right to a fair trial by an impartial jury, this Court advised lower courts that, when faced with a case that has been heavily reported in the news media, they should be "prepared to readily grant a change of venue." *Id.*

¶25. This Court's protection of an accused's right to a fair trial before an impartial jury is not a recent development. In *Eddins v. State*, 110 Miss. 780, 783, 70 So. 898, 899 (1916), this Court advised that "when it is doubtful" that a fair and impartial jury may be impaneled in the county where the crime occurred, venue should be changed. In that particular case, the crime committed was murder, and the accused faced the possibility of the death penalty. Here, the crime was sexual battery and the maximum penalty faced by Hickson was thirty years imprisonment. That distinction aside, the

admonishment given by this Court in *Eddins v. State* equally applies to the present case even though Hickson's life was not at stake because "[a]ll persons accused of crimes are entitled to a fair trial [before an impartial jury] . . ." *Fisher*, 481 So. 2d at 216. *Fisher v. State* is actually quite analogous to the case presented here, with the previously mentioned exception that, here, we are not dealing with a capital offense crime in which the defendant is exposed to the possibility of death. This Court's resolution of the pre-trial media coverage issue in *Fisher v. State* is dispositive nevertheless.

¶26. In that case, every juror called for jury service had heard about the charges against Fisher. Although this Court recognized that the average citizen forgets the details of media news reports, this Court still acknowledged that the community had been bombarded with not only "news" reports of the murder charge with which Fisher stood charged, but also with reports of a separate murder charge. It was also noted that, more likely than not, the quantity *and* quality of the media publicity impressed upon the minds of the average citizen that Fisher had raped and murdered both victims. Furthermore, this Court observed that not only did the news reports try and convict Fisher prior to his trial, the reports also repeatedly reported the evidence that the State had against him, some of which was inadmissible at trial, e.g., Fisher's connection with the other rapes and that he was previously convicted of a sex offense in Georgia.

¶27. Here, admittedly, we are not dealing with a rape-murder. Nor are we dealing with the same quantity and quality of media coverage. We are dealing, however, with the sexual battery of a church secretary which occurred in the pastor's office of a local church in a relatively small town, as well as a sexual battery in a video store located in the same community. All of the venire members readily recalled the church incident. Many of them admitted that the incident was commonly known in the community as the "Indian Springs Church rape," and many testified that the incident was so impressed upon their minds *because* it took place in a church. In addition, forty-seven of the eighty-six member panelists testified that they had been exposed to either the newspaper articles about the rape, and obviously the separate sexual battery charge against Hickson discussed in those articles, or the television reports or both. Moreover, the articles and television reports recounted the facts surrounding the victim's identification of Hickson, and in one article, it was reported that Hickson threatened the lives of the victim and her daughter if she told anyone about the rape. There was only one venire member who maintained that he had never read or watched anything concerning the charges against Hickson.

¶28. Despite their exposure to the pre-trial media publicity, the vast majority of the jury members unequivocally stated that they could be fair and impartial. The majority of them also opined that they did not believe the community had prejudged Hickson or was biased against him.[9] Of the twelve venire members who were impaneled on the jury, eleven had read or watched the media coverage of the case. Of course, all twelve maintained their ability to be fair and impartial.

¶29. In *Fisher*, this Court reasoned that, even though the great majority of jurors called for jury service in that case insisted that Fisher could receive a fair trial and that they would set aside what they had learned through the news media and heard otherwise, the saturation of the pre-trial publicity suggested that there was and remained a substantial doubt that Fisher could ever get a fair trial in that particular venue. *Fisher*, 481 So. 2d at 222. The fallibility of jurors' oaths has been recognized by this Court, as well as the Supreme Court of the United States. *Id.* (*citing Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961); *Groppi v. Wisconsin*, 400 U.S. 505

(1971); *Seals v. State*, 208 Miss. 236, 249, 44 So. 2d 61, 67 (1950)).

¶30. Here too, we conclude that despite the jurors' declarations of impartiality and the ability to be fair, it is doubtful, in light of the content of the articles about the other sexual battery charge against Hickson, that he obtained an impartial and fair trial in Jones County.

¶31. Indeed, the question about other charges against Hickson posed by one of the jury members during deliberations buttresses this conclusion. The Court of Appeals, in rejecting Hickson's arguments, emphasized that there was no evidence that the juror was referring to criminal charges against Hickson. However, "[w]e are not required to leave our common sense at home when we approach judicial resolution of these questions." *Fisher*, 481 So. 2d at 221. It is more likely than not that when the juror asked about "other charges" against Hickson she was referring to the other sexual battery charge as opposed to some civil matter.

¶32. The question then becomes whether that juror, and the others, considered or relied in any way upon this extraneous, improper information in reaching the guilty verdict. This question cannot be answered by this Court as the trial court properly refused to allow counsel to inquire further into the jury's deliberations. We can say this though. This case involved a factual dispute. The victim testified that Hickson, whom she positively identified at a festival approximately fourteen months after the incident, raped her. Hickson and the other defense witnesses testified that on the day the assault occurred Hickson, one, was at home and, two, did not fit the victim's description because he was sporting a full beard and mustache.[10] Also, the scientific evidence did not conclusively establish that Hickson was the rapist.

¶33. Where the resolution of a case comes down to factual disputes, the jury's role becomes paramount as it weighs the credibility of the witnesses and determines which factual accounts to accept or reject. Thus, it is absolutely imperative that the jury be unbiased, impartial, and not swayed by the consideration of improper, inadmissible information. We can not say, with any degree of certainty, that this was the case here because the fact of the matter is that the juror "threw the proverbial skunk into the jury [room]" during the deliberations by asking about other charges against Hickson. *See Dunn v. U.S.*, 307 F.2d 883, 886 (5th Cir. 1962) ("'[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it'").

¶34. The Court of Appeals was persuaded that nothing improper or prejudicial resulted from this action because the foreman promptly suppressed any discussion of the query; however, one juror intimated, but later recanted, that he, in fact, responded to the question. This Court is not convinced that the foreman's admonishment was as effective as the Court of Appeals concluded, in light of the fact that the jurors were undoubtedly exposed to the pre-trial publicity about the second charge.

¶35. It is, therefore, this Court's conclusion that the trial court abused its discretion in not changing venue in this case as the record evidence indicates that the Jones County community was exposed to pre-trial media publicity that was of such a character and content that Hickson could not have received a fair and impartial trial, evidenced in part by the improper question posed by a juror during jury deliberations about another charge against Hickson. Thus, we reverse and remand this matter for a new trial.[11]

¶36. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND REMANDED.**

**LEE, C.J., PRATHER, P.J., AND McRAE, J., CONCUR. SULLIVAN, P.J., CONCURS IN RESULT ONLY. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, ROBERTS AND MILLS, JJ.**

*SMITH, JUSTICE, DISSENTING:*

¶37. The evidence against Brian Clayton Hickson was substantial. The victim immediately called 911 after the rape and was taken to a hospital where a rape kit was completed. She promptly provided police with a statement and a description of her rapist and a composite was drawn. A subsequent sketch was drawn by a Hattiesburg police officer with the victim furnishing a description. The drawings are "dead ringers."

¶38. Fourteen months after the rape, the victim saw her assailant at the Arts and Crafts Festival in Ellisville and immediately told her sister that she had just seen the person who had raped her. Hickson's blood and saliva tests indicated that he was an O blood type secretor, allowing for the State's expert to conclude that Hickson could not be excluded as the rapist. More importantly, pubic hairs found at the scene of the rape were comparable to hairs removed from Hickson. These hairs were not comparable to those taken from the victim. The evidence submitted as to the identification of Hickson as the rapist was more than sufficient in support of the jury's verdict.

¶39. Hickson claimed alibi, that he was home babysitting his daughter at the time of the rape. He also argues that the victim's description of her assailant did not match his description at the time, because he had a full-grown beard and mustache at the time of the rape. However, a review of the victim's report to police indicates that her assailant did in fact have a very light mustache. The initial police composite could not be prepared according to the victim's description, because they only had dark beards available for composites at that time. But, the subsequent sketch made in Hattiesburg did in fact include a light mustache, per the victim's description. The majority apparently believes that the jury had already formed pre-conceived ideas as to Hickson's guilt and therefore, regardless of the evidence presented, the jury would have returned a verdict of guilty. The majority would reverse and remand based upon pre-trial publicity. I disagree and accordingly dissent.

¶40. Hickson relies upon, and the majority cites extensively *Fisher v. State*, 481 So. 2d 203 (Miss. 1985) and *Johnson v. State*, 476 So. 2d 1195 (Miss. 1985), two death penalty cases, both of which are clearly distinguishable from the circumstances existing in the case *sub judice*. Here, we are not confronted with the imposition of the death penalty, but rather simple rape. In my view the case at bar is more analogous to the cases of *Burrell v. State*, 613 So. 2d 1186 (Miss. 1993) and *Porter v. State*, 616 So. 2d 899 (Miss. 1993). Absent also is the quantity and quality of the media publicity that existed in *Fisher*. Nor is there a repeated bombardment of story upon story about other rapes or a

previously convicted sex offender, as in *Fisher*. Nor can much ado be made about this offense occurring in a church and how this fact supposedly prejudices a juror. It simply shows the trend of modern day thugs when they select victims--strike anyone, anywhere and anytime. No place is secure, sacred, or a haven for average citizens anymore, not a person's home, not even the church. Such is the reality of crime these days.

¶41. "On the issue of venue change, [the] Court will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying change of venue was not abused." *Harris v. State*, 537 So. 2d 1325, 1328 (Miss. 1989); *see also Box v. State*, 610 So. 2d 1148 (Miss. 1992). Here, the State presented seven witnesses, who all stated that they had watched or read media coverage, but who nevertheless, maintained that they could be fair and impartial.

¶42. Hickson presented six witnesses who maintained that the community could not be fair and impartial, and therefore Hickson had been prejudged. The trial court judge properly reserved his final ruling until after voir dire. Only forty-seven of the eighty-six member juror panelists testified that they had read newspaper articles or observed television reports, or both.

¶43. In *Johnson*, which involved the rape and murder of a convenience store clerk as well as the shooting of a police officer, sixty-four articles were published and fifty-four were front page stories, and the situation was a mixed race crime. Hundreds of news broadcasts aired several times a day and reported the crimes . *Johnson*, 476 So. 2d at 1211. Likewise, in *Fisher*, which involved the rape and killing of an eighteen year old high school senior, more than sixty stories were published, most of which were front page leading up to the very date of the trial. *Fisher*, 481 So. 2d at 218-19.

¶44. Here, the majority would reverse and remand the jury's decision based upon a grand total of only six news articles and two television stories which were introduced into evidence by Hickson. Unfair pre-trial publicity warranting a change of venue? Absolutely not. The trial judge's sound discretion should control. The majority is simply substituting its own judgment for that of the learned trial judge and in doing so goes far beyond where this Court has ever before ventured.

¶45. Absent from the case at bar are factors of a capital case with heightened scrutiny, crowds threatening violence toward the accused, or inordinate amounts of media coverage where the Court has found a presumption that an impartial jury cannot be obtained which is at certain times irrebuttable: "(a) serious crimes against influential families; (b) serious crimes against public officials; (c) serial crimes; (d) crimes committed by a black defendant upon a white victim; [or] (e) where there is an inexperienced trial counsel." *White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986). It is more than noteworthy to this dissenter, that none of the above mentioned factors are present in the case *sub judice*. Therefore, a rebuttable presumption arose after Hickson presented his written motion supported by affidavits of two witnesses, and the State clearly rebutted the presumption.

¶46. Here, the jurors all stated under their oaths that they could be fair and impartial and base their verdict solely on the evidence presented against Hickson. In *Burrell v. State*, 613 So. 2d 1186 (Miss. 1993)(Pittman, J.), citing *Weeks v. State*, 493 So. 2d 1280, 1286 (Miss. 1986), this Court finding that the State had successfully rebutted any presumption that adverse sentiment was such that the defendant could not receive a fair and impartial trial stated:

This is not a death penalty case, and the defendant's life was not at stake; there was no evidence

of crowds threatening violence; *the media coverage was not extensive, consisting entirely of four articles in the county newspaper* appearing on March 15th, March 29th, July 19th, and July 25th; although this was a serious and brutal offense, there was no evidence it was committed against a prominent or influential family; and this was a white on white crime and defense counsel was not inexperienced.

***Burrell***, 613 So. 2d at 1189-90 (emphasis added).

¶47. Significantly, in ***Burrell***, sixty of sixty-two venire persons summoned for jury duty admitted that they had heard about the case, and one fourth of the venire was struck for cause by the trial judge. As in the case at bar, all of the twelve jurors selected indicated that they could be fair and impartial regardless of what they had already read or heard. The Court found "no abuse of sound, judicial discretion." ***Id.*** at 1190. The Court also distinguished ***Burrell*** from the capital case of ***Fisher***. ***Id.***

¶48. In ***Porter v. State***, 616 So. 2d 899 (Miss. 1993), (Sullivan, P.J.), where twenty-one members of the jury venire "who had heard of the case and were upset, shocked, or bothered by what they heard also stated under oath that they would base their verdict solely on evidence presented at trial and either that media reports had not caused them to prejudge the guilt or innocence of Porter or that they presumed Porter innocent," this Court found that based on the questions and responses of the jury during voir dire, "it appears that an impartial jury was actually impaneled." ***Porter***, 616 So. 2d at 906. The ***Porter*** Court also found that "[t]he record does not reveal prejudgment of the case or ill will toward the defendant in the public mind." ***Id. Porter and Burrell*** appear to be on all fours with the case at bar.

¶49. Nor do I find any buttress to the majority's conclusion regarding the question posed by a juror during jury deliberations concerning the other "charges" against Hickson. The foreman and another juror testified consistently that when the question was asked about the other charge against Hickson, it was immediately quashed by the foreman, and that there was no further discussion of that issue. There is simply no evidence in this record to support that any juror, including the one who raised the question, relied or considered any other charge against Hickson in arriving at his verdict.

¶50. In ***Gladney v. Clarksdale Beverage Co. Inc.,*** 625 So. 2d 407 (Miss. 1993), (Sullivan, P.J.), this Court was confronted with an affidavit from a juror (Sartin) concerning another juror's (Turnage) alleged "inspection" of the accident scene of the night before the very night that the jury deliberated its verdict. The central issue of the case concerned negligent driving by excessive speed and failure to keep a proper lookout considering the low visibility at the intersection due to fog. Juror Turnage allegedly had told the other jurors that he lived close to the accident scene and had gone through the intersection in question. Sartin's affidavit did not contain any other specifics relating to visibility, trees, fog, or anything else obstructing or impairing a driver's vision at or near the intersection. The ***Gladney*** Court, citing ***Brake v. Speed***, 605 So. 2d 28, 37 (Miss. 1992), stated, "Sartin's testimony that Turnage had been through the intersection is not sufficient to prove that the jury was provided with any additional information outside the record of proceedings in open court; this does not constitute an outside influence under M.R.E. 606 (b)". ***Gladney***, 625 So. 2d at 414. The case at bar is analogous to ***Gladney***. The single juror's question here about other possible pending charges, without involving specifics and details, did not constitute "extra-record" evidence. The majority of jurors had already admitted to having knowledge about other possible pending charges against

Hickson during voir dire. The case at bar is in no way similar to the specificity and prejudicial nature required by this Court in *Gladney* when reversing cases. Additionally, it is unlikely that Hickson was prejudiced as a result of the juror's comment. The juror was unsure if in fact charges had been brought. Her comment was not specific. Her comment did not allege that criminal charges were even involved, or that criminal charges existed on the same offense, nor did it give details of specifics. In view of all of the evidence introduced during trial, i.e., the eyewitness identification and forensic evidence, it is not reasonable to believe that this vague comment or question by a single juror swayed the jury's verdict. More importantly, the foreman's admonishment to disregard the question posed by a single juror renders prejudice, if any, harmless. It certainly does not require reversal. *Wright v . State* 540 So. 2d 1 (Miss. 1989).

¶51. The case at bar is nothing like the quantity and bombardment of news coverage in *Fisher* and *Johnson*. Nor are there the factors usually present in these type cases when the Court reverses. Comparing six news articles and two television stories in the case *sub judice* to the sixty stories in *Fisher* is like comparing apples and oranges. The trial judge's sound discretion was not abused and this case should be affirmed.

¶52. I respectfully dissent.

**PITTMAN, ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. The petitioner also argues that the Court of Appeals erred in denying him the opportunity to present oral argument. This point of error clearly lacks merit as oral argument is discretionary unless mandated by statute or rule, neither of which is applicable here, and is therefore not treated.

2. Tina also testified that Hickson appeared to be startled when he saw her.

3. Tina's subsequent identification of Hickson in the photo lineup was not admitted into evidence at trial.

4. The remaining juror testified during voir dire that he had not seen the television reports or newspaper articles. During the course of the trial, one of the original jurors was excused for personal reasons. The alternate juror testified that she, too, had watched the television reports and read the newspaper articles about the charges.

5. Tina was also an O blood type.

6. Contrary to Hickson's assertions, Tina did, in fact, describe her assailant as having a very light mustache. A mustache was not included in the initial composite, however, because all of the pre-drawn mustaches in the kit were too dark or too thick. In the sketch that was drawn by a Hattiesburg police officer a few weeks after the rape at Tina's direction, a light mustache was included.

7. One of the witnesses, the group-selected foreman, testified that immediately after the juror asked this question he told her that such could not be considered as it was hearsay and that they were to consider only the evidence presented during the trial. The foreman maintained that this was the extent

of the discussion. Another witness testified initially, however, that he answered the question negatively, but later this same witness stated that the foreman quickly suppressed a discussion of the question. The third and final witness called by Hickson at the motion for new trial testified consistently with the foreman, i.e., that the question was asked but was immediately squashed by the foreman.

8. These assignments of error will be addressed simultaneously.

9. At the hearing on the motion for change of venue, the State presented seven witnesses who admitted that they had read or watched the media coverage of the charges against Hickson, but nevertheless maintained their ability to be fair and impartial. The defense, on the other hand, presented six witnesses, one of which was an investigator hired to mingle in the community to determine the extent of bias and prejudgment against Hickson. Except the investigator, all of the defense witnesses testified that they could not be fair and impartial and that Hickson had been prejudged. Thus, the evidence presented at the venue hearing was a wash with both sides presenting an almost equal number of witnesses in support of their opposing positions. As such, the trial court reserved final ruling on the issue until after voir dire. We, in turn, deal primarily with the evidence from voir dire.

10. Photographs of Hickson at various family gatherings taken around the time of the rape show Hickson with a noticeable beard and mustache.

11. Hickson also argues that one of the State's rebuttal witnesses testified to false information. We decline to treat this issue beyond stating that we agree with the Court of Appeals' application of the procedural bar as Hickson failed to object to the introduction of the witness' testimony.