CHANDLER, J.,
For the Court:
¶ 1. Terry Beasley was convicted by a jury of murder and possession of a firearm by a convicted felon. The Washington County Circuit Court imposed a life sentence on the murder charge and a three-year prison sentence on the firearm charge, with the sentences to run consecutively. Beasley appeals, citing the following grounds:
I. WHETHER THE TRIAL COURT ERRED IN FAILING EITHER TO DECLARE A MISTRIAL OR TO TAKE CORRECTIVE ACTION AFTER THE STATE ELICITED TESTIMONY FROM CAPTAIN DOYLE BARRETT IN VIOLATION OF THE RULES OF DISCOVERY;
II. WHETHER DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL’S FAILURE TO PROPERLY RESPOND WHEN PRESENTED WITH EVIDENCE INTRODUCED IN VIOLATION OF THE RULES OF DISCOVERY;
III. WHETHER THE TRIAL COURT ERRED IN SUSTAINING THE STATE’S OBJECTION TO DEFENSE COUNSEL’S ATTEMPTED IMPEACHMENT OF STATE WITNESS FREDDIE ROBINSON;
IV. WHETHER THE VERDICT WAS SUFFICIENTLY SUPPORTED BY THE EVIDENCE.
Finding no error, we affirm.
FACTS
¶2. Mary Suddeth was shot and killed with a large caliber gun in her home at Hollandale Trailer Park, located on Old Highway 61 in Hollandale, Mississippi. Suddeth collected rent from the trailer park tenants for the landlord and owner, Larry Kaplan. Defendant Terry Beasley lived in Hollandale Trailer Park with his girlfriend Marie Pam.
¶ 3. There were no witnesses to the actual murder and no physical evidence connected Beasley to the crime. However, circumstantial evidence placed Beasley inside or near Suddeth’s trailer at the time of her death. Freddie Robinson testified that Beasley had asked him to drive him to Suddeth’s trailer so he could pay his rent. Robinson, who was initially arrested for the murder, testified that he drove Beasley to Suddeth’s trailer and that he waited in the car while Beasley went inside to pay his rent. Robinson testified that he heard a loud noise that he initially thought was lightening. When he heard another loud noise which he identified as a gunshot, he panicked and drove away, leaving Beasley inside the trailer. On his way out, Robinson almost crashed into an automobile driven by Ethel Stamps. Robinson did not report the gunshot to the authorities because he did not want to get involved. When Robinson was arrested for the crime, he told the police what he knew. The police dropped the charges against Robinson and arrested Beasley for the crime. Robinson was never indicted for Suddeth’s murder. Beasley was indicted for capital murder and possession of a firearm by a convicted felon.
¶ 4. Leon Vallery was traveling south on Old Highway 61 at about 3:15 to 3:30 p.m. on the day of the murder. He saw a dark colored car parked in Suddeth’s driveway. Vallery identified Robinson’s car, which the police had impounded, as the car he saw in the driveway. Vallery testified that he saw a large black man seated in the driver’s seat of the car. He reported seeing the car after he heard that Suddeth had been murdered. At trial, it was established that Freddie Robinson, who weighed about 300 pounds, is a large, black man. Beasley is not a large man.
*1207 ¶ 5. Willie Bethley testified that at about 3:00 p.m. on the day of the murder, he and his brother were traveling down Old Highway 61 when they saw Beasley briskly walking toward town. Bethley commented to his brother that he wondered why Beasley was in this part of town, walking down the road on a rainy and cloudy day. Later that day, Bethley drove by Suddeth’s trailer and saw police cars at the trailer. He told Hollandale Chief of Police, Green Townsend, about seeing Beasley in the vicinity that day at about 3:00 p.m.
¶ 6. Larry Kaplan, the trailer park owner, testified to Suddeth’s practice in collecting the rent from the tenants. Every month, Suddeth would write each tenant’s name in a receipt book along with a notation of how much rent was owed for that month. When the tenant paid the rent, Suddeth would then write down the amount paid and give a copy of the receipt to the tenant. Kaplan testified that Marie Pam had called the day of the murder and asked if she could begin paying rent on the tenth day of the month rather than the first day of the month. Kaplan consented as long as Pam agreed to pay a prorated amount of $80, and then pay the balance of that month’s rent on the tenth. Thereafter, Pam could pay the rent on the tenth day of every month. Kaplan called Sud-deth at about 2:30 p.m. on the day of the murder to inform her about this arrangement.
¶ 7. The police found the receipt book in Suddeth’s trailer during their investigation. They discovered a receipt, made out to Beasley, indicating that $80 had been paid. The “$80 paid” portion of the receipt had been written in black ink. The remainder of the receipt had been written in blue ink. Suddeth had written “5th month, 10th day to 6th month to 10th day” indicating that the rent was to cover the period from May 10 to June 10. The “Is” were written in blue ink and the “0s” were written in black ink. This indicated that Suddeth, whose practice was to write out the amount owed at the beginning of each month, added zeros to reflect that Pam’s rent would now be due on the tenth of each month rather than the first. Kaplan testified that Suddeth never marked an amount paid until the tenant was actually standing in her presence with the rent in hand. However, Kaplan admitted that since he did not actually see Suddeth write in the $80 amount paid, he could not be absolutely sure that she did not write in this amount when she conversed with him at 2:30 that day. Of course, the implication was that Beasley had obtained entry to Suddeth’s home on the day of the murder to pay the $80.
¶ 8. Kaplan testified to Suddeth’s practice when admitting people to her home. He stated that Suddeth would look out of her door to determine who was knocking. If she was acquainted with the person, she would open her door and admit the person into her home. She did not admit people she did not know into her home. Since Suddeth was acquainted with Beasley, Kaplan surmised that she would have allowed him into her home.
¶ 9. Kaplan testified that Marie Pam was his tenant and that Beasley, Pam’s boyfriend, lived with her. At about 5:00 p.m. on the day of the murder, Beasley called Kaplan and told him that Suddeth had been killed. Kaplan thought it was unusual that Beasley called because he barely knew Beasley and had only conversed with Beasley approximately two times before Beasley called about Suddeth’s demise.
¶ 10. Marie Pam found Suddeth’s body when she went to Suddeth’s home to pay the rent. Pam testified that when she told Beasley about finding Suddeth, Beasley acted nervous, “like he knew what she was talking about.” Pam testified at first that she saw Beasley at her mother’s house at *1208 about 12:30 to 1:00 p.m. on the day of the murder and then did not see him again until about 6:00 p.m. that day. Then she testified that she saw him from the time she got to her mom’s house at about 12:30 to 1:00 until she left at 3:00 p.m. Pam saw Beasley for the last time on the day of the murder. They were no longer romantically involved at the time of trial.
¶ 11. Suddeth’s husband testified that on the night before his wife’s death, he had given Suddeth two $20 bills to hold until the weekend and that she had placed them in her billfold. The money was not in her billfold when her body was discovered. The contents of Suddeth’s handbag were scattered on the floor.
¶ 12. Beasley responded to the charges against him by trying to pin the crime on Robinson. Three witnesses who saw Robinson with a large caliber gun on the day of, or the day before, the murder testified. Frederick Emory, Lonnie Aultman, and Willie Richardson all testified about a gambling trip to Greenville that they had made with Robinson in the early morning hours of the day of the murder. Emory testified that he saw a .38 caliber gun in the back seat of Robinson’s car. Willie Richardson was holding the gun, but told Emory that the gun belonged to Robinson. Emory further testified that they returned to Hollandale from their gambling trip at about 6:00 a.m. the morning of the murder. When they passed Suddeth’s trailer on Old Highway 61, Suddeth was out in her garden. Emory testified that Robinson said: “Bet that b-’s got some money.” Emory testified that Robinson made this comment loud enough for everyone in the car to hear. Neither Aultman nor Richardson heard Robinson make this alleged comment. Emory admitted that he and the others, besides Robinson who was driving, had imbibed both alcohol and drugs. Emory admitted that he had smoked a rock of crack cocaine.
¶ 13. Lonnie Aultman, a/k/a Jab Turner, testified that he saw a .38 caliber gun in Robinson’s car that belonged to Robinson. Aultman testified that he saw Sud-deth outside of her trailer the morning they returned from their gambling trip. He did not, however, hear Robinson make any remarks about Suddeth.
¶ 14.. Willie Richardson, Robinson’s first cousin, was also in the car the morning of the gambling trip. He testified that he saw a .38 special on the passenger side in the front of Robinson’s vehicle on the morning of the murder. He did not know to whom the weapon belonged. Richardson did not recall seeing Suddeth when they returned to Hollandale at about 5:00 to 6:00 a.m. that morning. He admitted that he had been drinking and smoking “weed.” He stated that his cousin did not do drugs. Further, he did not hear Robinson say anything about Suddeth.
¶ 15. The jury found Beasley guilty of the lesser included offense of murder and possession of a gun by a convicted felon.
LAW AND ANALYSIS
I. DID THE TRIAL COURT ERR IN FAILING EITHER TO DECLARE A MISTRIAL OR TO TAKE CORRECTIVE ACTION AFTER THE STATE ELICITED TESTIMONY FROM CAPTAIN DOYLE BARRETT IN VIOLATION OF THE RULES OF DISCOVERY?
¶ 16. During Beasley’s cross-examination of Captain Doyle Barrett, Captain Barrett asked Beasley’s attorney if he wanted to know how he was “put on” to interview the three witnesses who testified that Robinson had a gun on the day of the murder. Counsel declined. During the State’s redirect examination of Captain Doyle Barrett, the State asked Captain Barrett to describe how he came across *1209 the three witnesses who allegedly saw Robinson with a gun. Captain Barrett revealed that Frederick Emory had been left alone with Beasley in a holding room for about one hour prior to Beasley’s arraignment. After Beasley’s arraignment, Beasley told Captain Barrett to talk to Fred Emory. Before Captain Barrett could complete his answer to the State’s question, Beasley’s attorney objected because this information had not been provided in discovery.
¶ 17. During a discussion between the trial judge and the attorneys outside the jury’s presence, it was revealed that Captain Barrett had disclosed this information in a page of his report that was inadvertently not provided to the defense. Captain Barrett’s report totaled eleven pages, but the State provided only the first seven pages of the report to the defense. It was apparent that the missing pages were not deliberately withheld from the defense and the defense admitted as much.
¶ 18. The defense attorneys objected to Barrett’s testimony about Beasley telling him to go talk to Emory. The trial court sustained the objection and did not allow the missing pages of the report into evidence. The trial court offered to continue the trial so Beasley’s attorneys could review the evidence. The attorneys declined the offered continuance. Beasley argues that the trial court should have sua sponte granted a mistrial or alternatively should have admonished the jury to disregard Captain Barrett’s testimony that Emory and Beasley had spent time alone together. Beasley argues that a continuance, pursuant to Box v. State, 437 So.2d 19 (Miss.1983), would have not remedied the situation. Beasley argues that Captain Barrett’s testimony implied that Beasley and Emory fabricated the story about Robinson having a gun on the day of the murder. If he had known this information, Beasley argues he would not have opened the door to it on cross-exam. A continuance would not have helped, according to Beasley, because the incriminating evidence was already before the jury. Beasley’s counsel characterized the situation as trying to “unring a bell.”
¶ 19. Beasley relies on McCaine v. State, 591 So.2d 833 (Miss.1991). In McCaine, the defense was provided with a copy of a tape-recording of a drug “buy-bust.” At trial, the State played the tape for the jury without objection by the defense. The next morning, the defense attorney objected to the tape’s introduction because the copy he received did not contain everything that the tape that was played for the jury contained. The attorney moved to suppress the tape; the trial court refused because of the belated objection. On appeal, the supreme court reversed, holding that a strict application of the Box factors would not have remedied the situation because the jury had already heard the entire tape. The court stated that the jury should have been instructed to disregard the tape or a new trial should have been granted.
¶20. Beasley objected to the undisclosed testimony and his objection was sustained and the evidence was excluded; in short, Beasley got exactly what he asked for. When the State’s questioning of Barrett resumed, no mention was made of the excluded evidence. The only potentially incriminating testimony the jury heard was that Emory and Beasley were alone for about one hour and that Beasley told Captain Barrett to go find Emory after the arraignment.
¶ 21. In Blackwell v. State, 44 So.2d 409 (Miss.1950), the supreme court stated:
It is now well settled that when anything transpires during the trial that would tend to prejudice the rights of the defendant, he cannot wait and take his chances with the jury on a favorable *1210 verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitled him to a mistrial. Such a motion was not made in the instant case, and since the trial judge did all he was asked to do at the time of the occurrence, the error complained of does not entitle the defendant to have the case reversed.
Id. at 410.
¶ 22. In the case sub judice, the trial court did all it was asked to do; specifically, it sustained Beasley’s objection to the testimony and excluded the offending evidence. This case differs from McCaine because after realizing his mistake, the defense attorney in McCaine objected and requested exclusion of the tape. The trial court denied McCaine’s request. The trial court in the present case complied with Beasley’s request and excluded the evidence. The trial court was not required to sua sponte grant a mistrial or admonish the jury.
II. WAS DEFENDANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL’S FAILURE TO PROPERLY RESPOND WHEN PRESENTED WITH EVIDENCE INTRODUCED IN VIOLATION OF THE RULES OF DISCOVERY?
¶ 23. Since strict application of the Box factors would not have “unrung the bell,” Beasley argues his attorneys should have moved for a mistrial or at least requested an instruction to the jury to disregard the offending testimony. Beasley argues that his attorneys were ineffective for not requesting such relief.
¶ 24. Beasley cites Swington v. State, 742 So.2d 1106 (Miss.1999), to support his argument that his trial attorneys were ineffective. In Swington, the defense attorney failed to request a continuance upon learning of a discovery violation by the State. The supreme court held that the attorney’s performance was deficient under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); however, the court held that the attorney’s deficient performance did not prejudice the defendant. The court held since Swington was unable to demonstrate prejudice, his attorney was not ineffective under the second Strickland prong.
¶ 25. Beasley argues that he was prejudiced by his attorneys’ deficient performance in two ways: (1) a mistrial would have been appropriate since the damaging information had already been revealed to the jury; and (2) the undisclosed evidence was the only evidence introduced which would impeach the credibility of the three witnesses who testified that Robinson had a large caliber gun on the day of the murder. If the jury had believed these three witnesses, it would be reasonable to infer that Robinson was the culprit instead of Beasley. Thus, the jury would not have been able to exclude the possibility that Robinson committed this crime and not Beasley. In a circumstantial evidence case, the jury would have had to acquit Beasley if it could not exclude the possibility that Robinson was the perpetrator.
¶ 26. To demonstrate prejudice, the defendant must show that “the lawyer’s errors were of such a serious magnitude as to deprive the defendant of a fan-trial because of a reasonable probability that, but for counselor’s unprofessional errors, the results would have been different.” Martin v. State, 609 So.2d 435, 438 (Miss.1992). The alleged error occurred when Captain Barrett testified that Beasley and Emory were left in a room together for approximately one hour. Then Captain Barrett stated: “And on the way back *1211 [to jail after the preliminary hearing] Mr. Beasley asked me to go find Fred Emory — .” At this point, Beasley’s counsel interjected an objection.
¶ 27. Beasley’s problem with Captain Barrett’s testimony is that it implied that Beasley and Emory had a chance to fabricate the story about Robinson’s gun possession and about the alleged comment Robinson made regarding Suddeth potentially having money. This Court is not convinced, however, that Beasley was prejudiced by Captain Barrett’s testimony, which was quickly curtailed by Beasley’s objection, to the point that a mistrial was warranted. After the in-chambers meeting to discuss Captain Barrett’s testimony, the trial proceeded without mention of the purported statement. It is unlikely that this one statement would cause the jury to disregard the testimony of all of Beasley’s witnesses.
¶ 28. We also fail to see how Captain Barrett’s testimony that Beasley told him to seek out Emory after Beasley and Emory were alone together for one hour could taint the testimony of the other two witnesses who saw Robinson with a gun. One of the witnesses was Robinson’s cousin. Aultman and Richardson corroborated Emory’s testimony that Robinson was in possession of the gun.
¶29. If Beasley is worried that Emory’s testimony that Robinson said “Bet that b-’s got some money” was impeached by Captain Barrett’s testimony, we must point out that Emory’s testimony was also impeached by Aultman and Richardson. While both of these witnesses corroborated Emory’s testimony that Robinson possessed a large caliber gun on the day of Suddeth’s murder, these witnesses did not hear Robinson make the incriminating statement Emory attributed to Robinson. Beasley has failed to demonstrate prejudice; thus, this ground of error is without merit.
III. DID THE TRIAL COURT ERR IN SUSTAINING THE STATE’S OBJECTION TO DEFENSE COUNSEL’S ATTEMPTED IMPEACHMENT OF STATE WITNESS FREDDIE ROBINSON?
¶ 30. During cross-examination, Beasley’s counsel questioned Robinson regarding a possible deal he made with the State in exchange for his testimony. It was revealed that about one year after Sud-deth’s murder, Robinson was arrested for a drug violation. Robinson pled guilty approximately four months prior to Beasley’s trial but at the time of trial Robinson had not yet been sentenced. During Robinson’s testimony in Beasley’s trial, members of the Central Delta Drug Taskforce were seated in the courtroom. The State had already established during its direct examination of Robinson that Robinson had a pending drug charge. The State then asked Robinson if anyone had made him any promises regarding the punishment he was to receive for the drug charge. Robinson responded that no one had made him any promises. On cross-examination, the following colloquy ensued:
Q. How long ago was it that you pled guilty, sir, approximately?
A. Well, I went in the courtroom I say like — okay I say it be like a month or two ago.
Q. Okay. And it’s your testimony that the district attorney or anybody else has not promised you anything about this.
A. Ain’t promised me nothing, sir.
Q. Hasn’t promised you anything?
A. No, sir.
Q. Well, you coming out pretty good though, aren’t you?
A. Sir?
Q. Had a capital murder charge dropped, an armed robbery charge dropped.
¶ 31. The State objected at this point. The State argued that Robinson testified *1212 several times that there had been no deal, and that it was inappropriate for Beasley’s attorney to continue to explore this line of questioning. While the attorneys were arguing over the objection, Robinson stated: “They ain’t made a deal with me, sir. I told the truth.” Noting that Robinson had never been indicted for the crime of murder and that dropping a charge was different that dismissing an indictment, and that there was no evidence of any agreement, the trial court did not allow Beasley’s attorney to further inquire into any ramifications of any agreement. Beasley was allowed to question Robinson about the pending drug charge and the fact that he had not yet been sentenced.
¶ 32. Beasley argues that the trial court curtailed his right to a broad and extensive cross-examination of the State’s main witness. Beasley cites Hall v. State, 476 So.2d 26 (Miss.1985), in which the supreme court held a trial court in error for limiting questioning of two witnesses regarding pending charges even though there was no evidence of a bargain. The supreme court stated that the witnesses may have believed that their testimony would affect the disposition of their own cases. The court held that Hall did not receive a fair trial because the trial court effectively prevented Hall to present his defense by limiting his questioning of these witnesses about their pending charges. In Suan v. State, 511 So.2d 144, 148 (Miss.1987), the court stated that the defendant was entitled to show that a witness’s neck was on the line if he did not testify in a manner pleasing to the State.
¶ 33. Beasley testified several times that there was no deal with the State. While Beasley was entitled to show the possibility that Robinson’s testimony was in part influenced by the drug charge and the impending sentencing, Beasley’s cross-examination could be restricted for “extremes of continual, aimless, repetition.” Patrick v. State, 285 So.2d 165, 167 (Miss.1973).
¶ 34. Beasley’s implication before the jury that Robinson “came out pretty good” by having the capital murder charge dropped was misleading. Robinson had never been indicted for the crime; thus, his testimony in Beasley’s trial could not have been motivated by the dropping of the murder charges against him. The trial court was correct in limiting this line of questioning.
¶ 35. As to the alleged deal between Robinson and the State regarding the sentencing in the drug case, the State and Beasley questioned Robinson about the existence of a deal. Robinson was asked, and answered, three times whether he was testifying against Beasley to receive preferential treatment in his sentencing on the drug charges. The trial court did not limit Beasley’s cross-examination; in fact, the court allowed the cross-examination. The court further allowed testimony regarding the presence of the Central Delta Drug Taskforce in the courtroom and also allowed testimony that even though Robinson had pled guilty several months before Beasley’s trial, he had yet to be sentenced. Beasley was allowed to fully establish that Robinson testified against Beasley in the hopes that he would receive preferential treatment when being sentenced on the drug charge.
IV. WAS THE VERDICT SUFFICIENTLY SUPPORTED BY THE EVIDENCE?
¶ 36. Circumstantial evidence need not exclude every possible doubt but only every other reasonable hypothesis of guilt. Tolbert v. State, 407 So.2d 815, 820 (Miss.1981). Further, “circumstantial evidence is not inferior to direct evidence when all the facts are considered,” Bogard v. State, 233 So.2d 102, 105 (Miss.1970), and is entitled to the same weight as direct *1213 evidence. Sherrell v. State, 622 So.2d 1233, 1238 (Miss.1993).
¶ 37. In Fisher v. State, 481 So.2d 203 (Miss.1985), Fisher was convicted of capital murder primarily on circumstantial evidence. The supreme court had reservations, but nevertheless deferred to the jury’s finding of guilt. The court stated:
This issue, however, turns not upon how we see the evidence, for there are, well established in hundreds of cases, rational and necessary limitations upon our scope of review of jury verdicts the substantial components of which involve resolution of issues of fact. We have said repeatedly ... that, if there is substantial evidence in the record of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairmind-ed men in the exercise of impartial judgment might reach different conclusions regarding the guilt of the defendant, we have no authority to disturb the jury’s guilty verdict. Here we are subject to the same limitations on our scope of review, only we are required to keep in mind the arguably stricter burden of proof placed upon the state in circumstantial evidence cases.
Id. at 214. The Fisher court noted that the jury was well instructed regarding Fisher’s theories of the defense.
¶ 38. In the case sub judice, the jury was instructed that to return a guilty verdict, it must find Beasley guilty beyond a reasonable doubt and excluding all other reasonable hypotheses other than that of Beasley’s guilt. The jury found Beasley guilty of murder. The evidence which supports the guilty verdict, while circumstantial, is sufficient to exclude Beasley’s hypothesis that Robinson committed the murder.
¶ 39. Robinson’s version of the events which transpired on the day of Suddeth’s murder were corroborated by other witnesses. An $80 receipt, made out to Beasley, was found in Suddeth’s possession. The color of the ink used to indicate that Beasley paid $80 matched the ink used to change the date that the rent was due from the first to the tenth. This evidence, which places Beasley in Suddeth’s trader on the day of the murder, corroborates Robinson’s testimony that Beasley was in the trailer. Leon Vallery saw a large black man sitting in a car which was later identified as belonging to Robinson. At trial it was established that Robinson was a very large black man. This corroborates Robinson’s testimony that he waited in his car while Beasley entered Suddeth’s trailer. Robinson admitted that he sped away from Suddeth’s trailer. This was corroborated by Ethel Stamps. This independent corroboration of Robinson’s testimony is sufficient to exclude him as the murderer.
¶ 40. Other evidence incriminated Beasley. Willie Bethley saw Beasley walking quickly down Highway 61 at about 3:00 p.m. on the day of the murder well within sight of Suddeth’s trailer. Beasley’s nervous telephone call to Kaplan made Kaplan suspicious. Pam’s testimony that Beasley acted nervous when she told him about finding Suddeth also implicates Beasley. Even had the jury believed that Robinson was in possession of a large caliber gun, possession of a gun alone does not raise a reasonable hypothesis that Robinson used the gun to murder Suddeth. The jury could have as easily hypothesized that Beasley, who was seen by witnesses other than Robinson in the vicinity of Suddeth’s home at the time she was murdered, could have used the gun to kill Suddeth.
¶ 41. In determining whether evidence is legally sufficient, all credible evidence consistent with the defendant’s guilt must be accepted as true and the prosecution must be given the benefit of all favorable inferences that may be reasonably drawn therefrom. McClain v. State, 625 So.2d *1214 774, 778 (Miss.1993). When legal sufficiency of the evidence is challenged, this Court may only reverse if the evidence is such that reasonable and fair-minded jurors could only find the defendant not guilty. Under this standard, the trial court was correct in finding that the evidence was legally sufficient for the case to go to jury.
¶ 42. JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT AND CONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF THREE YEARS, SAID SENTENCES TO RUN CONSECUTIVELY AND IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS HEREBY AFFIRMED. COSTS ARE ASSESSED TO WASHINGTON COUNTY.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., PAYNE, BRIDGES, THOMAS, LEE, IRVING and MYERS, JJ„ CONCUR.